UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINNET BROOKS, AARON BROOKS, | : | CIVIL ACTION |
| MICHAEL LUCY, ELIZABETH YODER, | : | |
| and MEGAN ABPLANALP on behalf of | : | |
| their minor daughters A.B., R.L., and Q.H., | : | |
| | : | |
| | : | Civil Action No.: |
| Plaintiffs, | : | **4:22-CV-01335-MWB** |
| | : | Hon. Matthew W. Brann |
| v. | : | |
| | : | Jury Trial Demanded |
| STATE COLLEGE AREA SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| Defendant. | : | |

## MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

Plaintiffs bring this Motion for Temporary Restraining Order/Preliminary Injection against Defendant, the State College Area School District and allege the following in support thereof:

1. Parents Linnet Brooks, Aaron Brooks, Michael Lucy, Elizabeth Yoder, and Megan Abplanalp bring this Temporary Restraining Order/Preliminary injunction on behalf of their minor daughters, A.B., R. L., and Q.H., for the

intentional exclusion of females from educational opportunities by the State College Area School District.

## JURISDICTION AND VENUE

2.  Plaintiffs bring this suit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et esq, and its interpreting regulations and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiffs' Federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4). Declaratory and other relief is authorized pursuant to 28 U.S.C. § 2201 and 28 U.S.C. §2202.

3.  Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C § 1391(b), because the events giving rise to Plaintiffs' claims occurred in this District. All Plaintiffs reside in the district, as does the Defendant State College Area School District.

## PARTIES

4.  Plaintiffs are the parents and natural guardians of A.B., R.L., and Q.H., who are female students residing in the district of and attend the State College Area School public school system (collectively "Plaintiff Parents" and "Plaintiff Players"). Plaintiff Players have all participated in ice hockey previously.

5.   The State College Area School District public school system ("SCASD") is the public school system for State College and surrounding townships in Centre County, Pennsylvania.  SCASD's main office is located at 240 Villa Crest Dr., State College, PA 16801.

6.   SCASD ice hockey club teams are sanctioned SCASD club sports teams that compete in the Laurel Mountain Hockey League. The SCASD ice hockey club teams are required to be chartered by a sponsoring school and have an academic advisor.

7.   The SCASD ice hockey club's academic advisor is an employee of the SCASD school system and is paid an extra stipend by the school system to act as the academic advisor.

8.   The Laurel Mountain Hockey League ("LMHL") is a hockey league that facilitates interscholastic play between participating schools.  Only teams with school sponsorship and school academic advisors are allowed to play in the league.

9.   The SCASD ice hockey teams compete in the LMHL as a "Closed (Pure) Program," meaning that the players must "attend a sponsoring school district that fields a team…" (Exhibit "A"; LMHL 2021-2022 Playing Rules; Eligibility - Teams, Art 2, §2.01(B)(1)).  Students who "do not attend the sponsoring school district are not allowed to play for the

associated team." Id. In order for a team to qualify to be a closed program, "[p]layers must follow sponsoring school district policies." Id. Art 2, §2.01(B)(1). The LMHL requires the certification of academic eligibility and must be "Declared in good academic standing with attending school district." Id. Art 2, §2.03(H)

10. The State College Area School District Ice Hockey Club, also registered as the SCASD Ice Hockey Club a/k/a SC Ice Hockey Club, ("IHC") is a parent-run booster club incorporated in Pennsylvania and organized to help facilitate the SCASD ice hockey club teams' play in the LMHL. (Exhibit "B";  IHC "By-laws of SC Ice Hockey Club" ). The IHC has no ability to enter a team in the LMHL without school sponsorship and is reliant on SCASD school sponsorship. SCASD ceded complete and unfettered control of the ice hockey club teams to IHC and/or the IHC appointed coaches, therefore IHC is an agent in fact of SCASD for the administration and organization of the ice hockey club teams. However, the IHC has no authority within its own by-laws for such actions and no legal agreement with the school that states such authority.

11. The State College Youth Ice Hockey Association ("SCYIHA") is a private organization that accommodates league play in the Pittsburgh Area Hockey League ("PAHL"). SCYIHA does not need school sponsorship in order to

roster teams in PAHL and is not subject to Title IX. These teams are typically associated with ice rinks and not schools.

## **BACKGROUND**

12. In or about 2001, SCASD created a club program for sports that were not within purview of the Pennsylvania Interscholastic Athletic Associate ("PIAA"). (Exhibit "C"; 2001 SCASD club sport application packet). This came at the behest of SCASD students who played ice hockey for private teams and wished to be officially recognized by SCASD so they could compete in the scholastic hockey league for their school. The SCASD club sports programs are afforded the same status as a SCASD recognized PIAA sport: referred in the daily announcements and bulletins, reported on in the school and local newspapers, posting signs with administrative approval, the award of letters, yearbook space, same access to facilities, etc. Id. at p.4 §4.

13. The sports club application establishes that "the coach will be responsible for the Club Sports team in all aspects of the program…" Id. at p.3, §3(B)). It was the intention of SCASD to cede complete operational control to third-parties and retain no oversight of the club programs.

14. Club sports are recognized as "a 'Class A' State College Area School District Related Organization." Id. p.4 § 5.  Non-profit/non-school related

organizations, which is what the IHC would be if it was truly independent of SCASD, are "Class C." Id.

15. In or about 2004, the IHC formed as a parent-run not-for-profit corporation designed to help facilitate the teams' play in the LMHL. The mission of the organization is to "provide opportunities " to middle school and high school students. (Exhibit "B" – By-laws of SC Ice Hockey Club).

16. The IHC's primary place of business is located at 650 Westerly Parkway, South Building, State College, PA 16801, which is the physical location of SCASD's State College Area High School. (Exhibit "D"; Pa. Dept. of State registration).

17. At some point after formation of the IHC, SCASD ceded 100% control of the SCASD ice hockey club teams to the parent-run IHC instead of the designated coach. There were no written or oral agreements as to the transfer of control, however, it was apparently the intent of SCASD to have no supervisory oversight of the IHC whatsoever as to the administration or operation of the SCASD ice hockey club teams.

18. From 2004 until at least 2016 there would be one or two middle school teams, based upon the number of SCASD students trying out.

19. Traditionally, SCYIHA, the private ice hockey organization local to State College, supports a girls' team that competes in the PAHL.  For various

reasons, SCYIHA did not roster a girls' team for the 2022-202 season and is not expected to do so in the near future. While it attempted to do so, SCYIHA was unable to successfully roster a co-ed team that could accommodate female athletes over the age of 12.

20.   In or about February of 2022, it was known that the opportunities for females to participate on SCYIHA league teams would be limited and Plaintiffs gave notice to the IHC that the best viable option to accommodate the female athletes would be to make sure there were enough middle school teams to roster as many athletes as possible.  The middle school teams are co-ed and non-checking, which made it optimal for both male and female athletes.

21.   On April 12, 2022, the SCASD middle school team had tryouts where 34 SCASD students attended, including at least 4 females.

22.   On April 15, Plaintiff Parents emailed the appointed coach of the middle school team, reiterating the lack of opportunities for females and pointing out that there were enough players trying-out to roster two middle school teams. This was declined due to a theoretical lack of ice times available, despite the IHC not actually enquiring about ice time availability. (Exhibit "E"; e-mail dated April 15, 2022).

23. On April 19, 2022, Plaintiff Parents emailed a representative at Pegula Ice Arena, which is owned and operated by the Pennsylvania State University, to determine if ice time for a second middle school team was available. The representative stated that the ice arena would be happy to work with the interested parties to accommodate the female athletes, but someone from the IHC would need to initiate those conversations. (Exhibit "F" e-mail dated April 20, 2022).

24. On April 26, 2022, a second try-out for the middle school team was held. One of the female athletes who had attended the prior try-outs did not return because she knew that the chances of gaining a roster spot when competing with the boys was futile.

25. On April 27, 2022, the final roster for the 2022-2023 middle school team was posted.  Nineteen boys but no girls were rostered.

26. Of the nineteen boys who were rostered on the middle school team, all but one were also rostered on one or more other hockey teams, including but not limited to the private SCYIHA league and tournament teams.  It is believed that at least six of the boys are rostered on a total of three separate teams playing at Pegula Ice Arena.

27. Plaintiff Parents reached out to the IHC board to again ask it to accommodate the female athletes since there were currently no girls over

the age of 12 rostered on any team located in State College while at the same time there were boys rostered on as many as three teams. (Exhibit "G"; e-mail dated April 27, 2022).

28. On April 28, 2022, in an attempt to find some sort of solution that would accommodate the female athletes, Plaintiff Parents again reached out, even offering to have a third party mediate the situation. Chrissie Ebeck, the President of the IHC, again stated that it was due to lack of ice time. Ms. Ebeck stated that the IHC Board's decision to roster only one middle school team was final. (Exhibit "H"; e-mail dated April 28, 2022).

29. It is the position of the IHC that it is not subject to Title IX or any other statutory or constitutional protections for SCASD students because they are a private corporation. Despite being a recipient of federal assistance and an operator of a public-school sports team, the IHC believes it is exempt form anti-discrimination laws.

30. On April 29, 2022, Plaintiff Parents sought the intervention of the SCASD school system in the situation since the third-party parents who controlled the IHC were not amenable to finding solutions. (Exhibit "I" – email dated April 29, 2022). Plaintiffs explained the situation to Chris Weakland, SCASD Athletic Director, Dr. Seria Chatters, SCASD Diversity and

Inclusivity officer, and Andrew Wilson, the ice hockey club Academic Advisor appointed by SCASD.

31. On or about April 29, 2022, it is believed that Chris Weakland met with the academic advisor, Andrew Wilson, to confirm that there would be no financial impact to SCASD if there was a second middle school team. Andrew Wilson was supportive of adding a second team and could offer no reason as to why SCASD should not do so.

32. No later than April 29, 2022, SCASD had actual knowledge that the female students were interested in forming a team and that there were enough players to form a team, that there was no cost to the school associated with the team formation, and that the academic advisor was in approval of the expanded opportunities for the female athletes.

33. On or about May 3, 2022, Chris Weakland, as a representative of SCASD, met with the IHC board where he requested that the IHC roster a second team. However, the IHC informed Mr. Weakland that he was without authority to suggest and/or insist on the rostering of a second middle school team.

34. Accepting that SCASD had ceded 100% control of the ice hockey teams to the third-party parents with no retained oversight, SCASD made no further

attempt to accommodate the female athletes or communicate with Plaintiff Parents.

35. On May 12, 2022, believing that SCASD had given written authority to the IHC to administer the ice hockey club program, Plaintiffs sought an injunction in the Court of Common Pleas, Centre County, Pennsylvania, Docket No. 2022-0997.  Believing that SCASD wanted to find a resolution, Plaintiffs provided SCASD an advanced copy of the injunction in hopes that all parties could enter into a dialogue to find solutions.  Despite knowing otherwise, SCASD failed to inform Plaintiffs that SCASD had no actual agreement with the IHC and that SCASD was the ultimate responsible party.

36. On May 15, 2022, the IHC retaliated against the female athletes by stating that they would need to travel to Altoona, a city more than 40 miles from Pegula, and play for a private Catholic school if they wanted to compete on a team in the same league as SCASD.  This also stripped Plaintiffs of other benefits that are afforded to their male counterparts who play for the SCASD middle school team.  SCASD endorsed the retaliation and unequal treatment. The requirement to play for a private religious institution is also a violation of Plaintiff Players' First Amendment rights.

37. The IHC then expanded their excuse for not rostering a second team in order to create more artificial barriers, stating it was a safety concern to have more than 19 players on the ice during practice. The IHC was unable to articulate an actual number of players that could practice safely.

38. SCASD knew at all times that the safety concern was completely false and that USA Hockey, the parent organization of all hockey programs in the United States, has practice plans for upwards of 45 players on the ice at a time.

39. On May 17, 2022, despite knowing that the safety concerns were a blatant falsehood, Plaintiffs gave notice that they had enough players, coaches, and **a separate ice time** to roster a second team without any impact to the IHC, however, this offer to the IHC was not accepted, with no reason ever given.

40. Alternatively, on May 19, 2022, Plaintiffs asked SCASD to be able to roster a second team independent of the IHC which was also declined.  SCASD stated that it was not interested in sponsoring a second team that would accommodate the female athletes.

41. Therefore, on May 19, 2022, SCASD knowingly and intentionally blocked the girls from forming their own team and knowingly and intentionally violating Title IX and the 14th Amendment of the U.S. Constitution.

42. On or about May 23, 2022, it became known to Plaintiffs that SCASD had never entered into any written or oral agreement with the IHC for the operation and administration of the SCASD ice hockey club.

43. On May 31, 2022, Plaintiff Parents contacted the acting SCASD Superintendent, Curtis Johnson, asking for SCASD to ensure that SCASD student were not being discriminated against due to gender or other immutable characteristics when participating in third-party clubs such as the IHC. Mr. Johnson explained that it was the position of SCASD that once a club is controlled by a third-party, SCASD is no longer responsible to protect the rights of its students during club activities.

44. On June 2, 2022, Plaintiff Parents filed a Title IX grievance with Linda Pierce, SCASD's Title IX Coordinator. It was the position of the Title IX Coordinator that as long as the females had an opportunity to try out for the co-ed team, the Title IX requirements were fully met.

45. Linda Pierce informed Plaintiffs that the Title IX investigation would be completed between June 30 and July 11, 2022.

46. On July 27, 2022, still having no word from SCASD, Plaintiff Parents enquired about the status of the Title IX investigation.  SCASD responded that the investigation had not yet been completed because they were performing a financial impact analysis to investigate the cost associated

with expanding the SCASD ice hockey club program to accommodate the female middle school athletes, even though SCASD knew at all times relative that there would be no additional financial impact to the school.

47. On or about the same day, it was officially announced that the SCASD ice hockey club program would be adding a high school Junior Varsity team to accommodate the boys who did not or could not make the high school Varsity team.

48. To Plaintiffs' knowledge, no financial impact analysis was conducted to investigate costs associated with rostering a Junior Varsity team to accommodate male athletes who had not made the varsity team. This is because SCASD knew at all times relative that there would be no additional financial impact to the school.

49. SCASD knew at all times relative that time was of the essence in accommodating the female students due to the need to schedule ice time, with practices starting at the beginning of September and games beginning in October.

50. On August 15, 2022, SCASD issued a report in response to the Title IX grievance filed by Plaintiffs in which SCASD admits that it is in overall non-compliance with Title IX. (Exhibit "J"; Title IX response dated August 15, 2022).

51. SCASD conducted a three prong analysis of its Title IX compliance as is laid out by court precedence, including 1) substantial proportionality; 2) a history and continuing practice of expanding sports participation opportunities for girls; or 3) full and effective accommodation of the athletics interest of the girls enrolled as the school. Id. at p.5, ¶1.

52. SCASD found that it **was not** in compliance with prong one of Title IX analysis and the participation gap overall was at 9.471% and its participation gap in high school grades was 12.191%. Id. at p.5, ¶6. SCASD acknowledge that anything over 5% is out of compliance.

53. SCASD found that it **was not** in compliance with prong two of the Title IX analysis and that it had not made significant strides in expanding access to females in recent history. Id. at p.6, ¶1.

54. SCASD  **was not** in compliance with prong three by knowingly and intentionally denying Plaintiffs the opportunity to form their own team, however, SCASD tried to dismiss prong three by essentially finding that females do not really want to participate in sports, therefore, SCASD does not need to look at providing more opportunities for them. Id. at p.7, ¶4.

55. The report issued by SCASD also appears to be flawed in several ways where SCASD attempts to justify its non-compliant status, including but not limited to:

a. Failure to recognize that sport clubs explicitly fall within Title IX.

b. Inappropriately counting cheerleading and/or competitive cheerleading as a Title IX sport in order to try to meet its numbers.

c. Double counting the same female participants and/or sports (e.g. Cheerleading and Competitive Cheerleading).

d. Failure to count the 19 middle school ice hockey players in their proportional analysis, bringing the proportional difference between male and female middle school participation to 5.3%, outside SCASD's own delineated safe harbor provision.

e. That it has no requirements for the addition of new female sports.

f.  Failure to account for adding a Junior Varsity team that will accommodate disproportionately more boys than girls.

g. Failure to account that it did not include any of the ice hockey club sports in its analysis which would have shown even poorer compliance.

h. Claiming that the ice hockey team is supposedly "co-ed" but bases acceptance on physical ability, which is not equal between males and females.

i. Falsely claiming that there is no interest by female participation to play ice hockey after intentionally blocking the girls from forming their own team.

j. Falsely claiming that monetary expenditures between male and female sports are equal, by allocating equal shares of money toward males and females in co-ed sports when there not equal numbers of males and females participating (e.g. wrestling where SCASD, solely for the purposes of its Title IX analysis, allocates the funds 50/50 between boys and girls sports even though there are 74 boys and only one girl on the co-ed PIAA teams).

k. SCASD spends approximately 19% more per year on male athletes than female athletes, that is $70.87 more per each male athlete than female athlete per year, or a total of $215,788.

l. Finding that forcing girls to play at a private Catholic school in a city 80 miles further away, round trip, is an "inconvenience" to female athletes as opposed to a blatant violation of Title IX.

m. Not addressing LGTBQ+ discrimination.

n. Failure to account for there being absolutely no justifiable reason not to accommodate the female athletes request to play ice hockey.

(Exhibit "J"; Title IX response dated August 15, 2022, *generally*).

56. Most significantly, SCASD justified its exclusion of girls from playing ice hockey because it found that it had "maxed out its sports offerings for girls and that there are not other sports that could be offered in which there is enough interest by the girls to be able to field a team. This is especially so at the middle school level." (Exhibit "J"; p.7 ¶4).

57. Recipients of federal funding are precluded from using discriminatory methods in assessing athletic interests. (*See* Dear Colleague Letter dated April 20, 2010 at P.4

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420_pg4.html).

58. Recipients should be assessing "interests of the underrepresented sex by examining: … requests by students and admitted students that a particular sport be added… participation in club or intermural sports… interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports…" Id. at P.6.

59. SCASD determined that, since there were fewer girls playing soccer than boys and that there were fewer girls playing basketball than boys, that there was no interest in girls playing ice hockey. (Exhibit "J"; p.7 ¶4).

60. SCASD's assertion was obviously knowingly false since they had intentionally blocked the girls from the opportunity to form their own team. There was female interest in ice hockey and had not maxed out the sports offerings or the Title IX grievance would not have been initiated.

61. Despite knowing at all times that a second middle school team would have no financial impact on SCASD, SCASD spent seventy-five days on the investigation in a brazen attempt to run out the clock on the female athletes.

62. There was no similar investigation into costs associated with the addition of the Junior Varsity team when male athletes benefited from it. The JV team was added with no questions asked.

63. Each time that SCASD applies for or receives federal financial assistance, as a condition precedent to receipt of federal funds, SCASD must file an Assurance of Compliance with the Department of Education that it is in Title IX compliance. 34 C.F.R. § 106.4.

64. SCASD has done nothing and plans to do nothing to correct its Title IX non-compliance.

## <u>LEGAL STANDARDS – TITLE IX</u>

65. Plaintiffs incorporate by reference the preceding paragraphs as if set forth in length.

66. Title IX provides in pertinent part that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

67. Subsequent regulations provide that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a).

68. Subsequent regulations provide further provide that "[a] recipient which operates or **sponsors** interscholastic, intercollegiate, **club** or intramural athletics **shall** provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c)(*emphasis added*).

69. Recipients are specifically prohibited from, on the basis of sex:

   a. Provide different aid, benefits, or services or provide aid, benefits or services in a different manner;

   b. Deny any person any such benefit or service;

    c.  Aid or perpetuate discrimination against any person by providing

        significant assistance to any agency, organization, or person which

        discriminates on the basis of sex in providing any aid, benefit, or

        service to students or employees.

    d.  Otherwise limit any person in the enjoyment of any right, privilege,

        advantage, or opportunity.

(34 C.F.R. § 106.31(b)(2), (3), (6) & (7)).

70. At all times relative, SCASD has accepted and benefited from federal funds and assistance, operates or **<u>sponsors</u>** interscholastic, **<u>club</u>**, or intramural athletics and SCASD is subject to Title IX.

71. Taking a "hands off" approach to club sports was wantonly negligent and it was easily foreseeable that turning a blind eye to the acts of third-party parents would lead to eventual discrimination in many forms. (Exhibit "J"; p.4 ¶2).

72. SCASD is also subject to the Constitution of the United States.

73. In order to prevail on injunctive relief in general, petitioners must demonstrate that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in favor of the petitioner; and 4) an injunction is in the public interest.

74. In order to prevail on a Title IX preliminary injunction, more specifically, plaintiffs must show discrimination is a failure of "effective accommodation" based on 34 C.F.R. § 106.41(c)(1), or "equal treatment" based on 34 C.F.R. § 106.41(c)(2)-(10). *See* <u>Biediger v. Quinnipiac Univ.</u>, 691 F.3d 85, 92 (2d Cir. 2012).

## 1. **<u>Failure of effective accommodation</u>**

75. At all times relative, SCASD knew that there was a significant interest in girls playing ice hockey for the SCASD club team.

76. At all times relative, SCASD knew that there were enough players, coaches, and opportunity for ice time available for a second middle school team in order to accommodate the needs of all SCASD students.

77. At all times relative, SCASD knew that there would be no additional financial impact on the school system. All additional costs would be funded by the players' parents.

78. At all times relative, SCASD knew that the academic advisor was willing to accommodate the second middle school team with no additional financial burden to the school system.

79. At all times relative, SCASD knew or should have known that it was not in Title IX compliance.

80. No later than August 15, 2022, SCASD knew that it was in overall non-compliance with Title IX but decided that girls don't really want to play sports and therefore ruled out accommodating female athletes on the middle school ice hockey team. (Exhibit "J"; p.7 ¶4).

81. At all times relative, SCASD knew that boys and girls are not on a level playing field when competing against each other for limited roster spots on a co-ed sports team.

82. At all times relative, SCASD knew that it could effectively accommodate the interest of its female students by allowing them to form their own team.

83. The stated philosophy of SCASD interscholastic athletics is "[t]he Board of School Directors believes that the purpose of an interscholastic athletic program is to provide learning experiences that will contribute to the personal, physical and psychological development of the individual student athlete … Hence, participation in interscholastic athletics can serve an important role in meeting the needs of our students within the total educational process." (*See* State College Area School District Athletic Department – Student Athlete/Parents Handbook, Exhibit "K" p.3).

84. The Student Athlete/Parents Handbook further states "At the Middle School / Junior High level, student-athlete participation and development of skills in a sport are valued above the winning of contests. It is an expectation that

at a middle school competition, all student-athletes will participate." Id at p.22.

85. Despite the foregoing, SCASD knowingly and intentionally blocked the female athletes from forming their own team for no express reason other than SCASD was not interested in doing so, while at the same time accommodating male athletes who did not make the Varsity team by creating a Junior Varsity team.

86. SCASD knows that it is in stark violation of Title IX by excluding females while at the same time, creating more opportunities for males.

### 2. **Failure to provide equal treatment**

87. After blocking the girls from forming their own team, on May 17, 2022, the IHC and SCASD stated that the only accommodation they would make for female athletes is to have them join a private Catholic school team located in Altoona, Pennsylvania in the same league the SCASD teams play in. The Catholic school team practices at Galactic Ice Arena in Altoona, PA.

88. Galactic Ice Arena is more than forty additional miles away (80 miles round trip) from Pegula Ice Arena.

89. Galactic Ice Arena is an additional hour and a half or more of round-trip travel time.

90. Playing for a different school denies Plaintiff Players a SCASD academic advisor, access to tutors, training facilities, and institutional support afforded to the counterpart male athletes. (Exhibit "J"; p.7 "Amenities").

91. Plaintiffs would be forced to play for a religious school in violation of their First Amendment Rights.

92. SCASD does not deny that the discrimination in facilities, academic tutoring services, institutional support, or practice schedule is unequal treatment in its response to Plaintiffs' Title IX Complaint. (Exhibit "J"; p.9 "VII. Retaliation").

93. SCASD believes that female athletes having to travel further, spend more money, and spend more time than their male counterparts is a mere inconvenience as opposed to unequal treatment. Id.

94. SCASD and the IHC are forcing Plaintiffs to accept unequal treatment in order to participate in athletics and are in clear violation of Title IX.

**3.  Plaintiffs are Likely to Succeed on the Merits**

95. Plaintiffs are likely to succeed on the merits. Plaintiffs have laid out, and Defendant has admitted to, *per se* violations of Title IX.  Despite knowing it is in violation, Defendant has stated that it has no intent on rectifying the violations and continued to block the girls from playing ice hockey.

**4.  Plaintiffs will Suffer Irreparable Harm.**

96.  Plaintiff Players will suffer irreparable harm unless SCASD is stopped from excluding Plaintiffs from the middle school ice hockey club program.

97.  Plaintiff Players will lose valuable time to develop as athletes and individuals if they are not allowed to participate in SCASD sports clubs. (Exhibit "L"; Affidavit of Christine Brooks with CV).

**5.  The Balance of Equities Tips in Favor of Plaintiffs.**

98.  The balance of equities weighs heavily in favor of the Plaintiff Players. There would be no financial detriment to SCASD and SCASD would be fulfilling its mission statement which is to educate and prepare students for the future.

**6.  Precluding SCASD from Discriminating Against its Female Students is in the Public Interest.**

99.  Congress passed Title IX specifically because it is in the best interest of society to ensure that females have equal access to educational opportunities.

WHEREFORE, Plaintiffs, on behalf of their minor children, request that this Court enter judgment on their behalf, requiring Defendant to ensure that the female athletes are readmitted to the ice hockey club and rostered to the SCASD middle school ice hockey club team with equal treatment and benefits as all other members of the ice hockey club as well as any other remedies

deemed necessary and proper including cost of suit and reasonable attorney fees.

## LEGAL STANDARDS -
## VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE
## FOURTEENTH AMENDMENT TO THE UNITED STATES
## CONSTITUTION.

100. Plaintiffs incorporate by reference the preceding paragraphs as if set forth in length.

101. In addition to SCASD violating Title IX, SCASD also violated Plaintiffs' constitutional protections and therefore violated 42 U.S.C. § 1983.

102. SCASD has shown a willful and wanton disregard for the rights and privileges of its students as well as taken active steps to discriminate and retaliate against its students.

103. Plaintiffs are entitled to a temporary restraining order and/or preliminary injunction for SCASD's acts and omissions.

104. SCASD, acting under color of law, deprived Plaintiff Players of their rights by adopting and implementing policies that discriminate against Plaintiff Players.

WHEREFORE, Plaintiffs, on behalf of their minor children, request that this Court enter judgment on their behalf, requiring Defendant to ensure that the female athletes are readmitted to the ice hockey club and rostered to the

SCASD middle school hockey team with equal treatment and benefits as all other members of the ice hockey club teams as well as any other remedies deemed necessary and proper including costs of suit and reasonable attorney fees.

Respectfully submitted,

Dated: August 29, 2022

/s/ Aaron Brooks /s/
Aaron Brooks PA# 207801
Attorney for Plaintiffs
765 Beaver Branch Rd.
Pennsylvania Furnace, PA 16865
(814) 852-8264
Atbrooks96@yahoo.com