## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINNET BROOKS, AARON BROOKS, MICHAEL LUCY, ELIZABETH YODER, and MEGAN ABPLANALP on behalf of their minor daughters A.B., R.L., and Q.H., | No. 4:22-CV-01335<br><br>(Chief Judge Brann) |
| Plaintiffs, | |
| v. | |
| STATE COLLEGE AREA SCHOOL DISTRICT, | |
| Defendant. | |

## MEMORANDUM OPINION

### DECEMBER 1, 2022

The Plaintiffs in this matter are middle-school aged female students who want to play ice hockey. After their previous local team was disbanded, they tried out for the co-ed club team in their school district. Of the nineteen players who made the cut, none of them were female. The Plaintiffs then worked to reserve ice time, find a coach, and assemble enough additional players to field a second team—a team their parents offered to manage and organize. The school district, perhaps at the behest of the club team's parent-run booster club or perhaps not, declined involvement. Plaintiffs and the school district then went back and forth with Title IX grievances and findings, all culminating in Plaintiffs' filing of this lawsuit and Motion for a Preliminary Injunction.

This matter is heated—indeed, the facts as alleged involve upset parents, an inflexible school district, and a parent-run booster club that seems particularly adverse to finding a solution to accommodate interested female students. But, setting all of the drama aside, the heart of this matter is that a handful of interested female students in State College want to play ice hockey for their school, and the question for the Court is whether the school district's failure to accommodate them violates federal law and warrants injunctive relief to prevent those female students from suffering continued irreparable harm. For the reasons stated below, the Court finds that preliminary relief is warranted, and Plaintiffs' Motion for a Preliminary Injunction is granted.

## I.    BACKGROUND

This matter revolves around the alleged failure of State College Area School District (the "District") to create an ice hockey team for interested female students. Plaintiffs are the parents and natural guardians of those minor female students, filing suit on their behalf.[1] The District's ice hockey teams are "sanctioned [District] club sports teams that compete in the Laurel Mountain Hockey League," and District ice hockey teams are required to be chartered by a sponsoring school and to have an academic advisor employed by the District.[2] The District has a District Ice Hockey Club ("IHC"), which is a parent-run booster club organized to help facilitate the

---

[1]    Doc. 1 at ¶ 1.
[2]    *Id*. at ¶ 7.

District's ice hockey clubs at the various levels (middle school, junior varsity, varsity).[3] The IHC has no ability to enter a team into the hockey league without school sponsorship and is reliant on school sponsorship and involvement.[4]

From 2004 until 2016, there were to be one or two middle school ice hockey teams, based on the number of District students who tried out.[5] In early 2022, due to the private girls' ice hockey team being discontinued by the local rink, Plaintiffs gave notice to the IHC that there would need to be a middle school team to accommodate the interested girls.[6] The middle school teams are co-ed and non-checking, which is ideal to accommodate both male and female athletes.[7]

The District held ice hockey tryouts in April 2022, where 34 District students attended—at least four of whom were female.[8] A second round of tryouts were held later that month, and only three females attended.[9] The final roster for the single middle school team was posted at the end of April, and the roster included nineteen players—all males, no females.[10] Plaintiffs allege, and attach evidence of correspondence indicating, that they made repeated requests that the District create another team that could accommodate the girls.[11] The District (via IHC) did not

---

[3]   *Id.* at ¶ 11.
[4]   *Id.* at ¶ 11.
[5]   *Id.* at ¶ 19.
[6]   *Id.* at ¶ 21.
[7]   *Id.* at ¶ 21.
[8]   *Id.* at ¶ 22.
[9]   *Id.* at ¶ 25.
[10]  *Id.* at ¶ 26.
[11]  *Id.* at ¶¶ 28-34.

create a second team for a number of stated reasons, including a lack of available rink time, ambiguity about where the decision-making authority lies to create a second team (*i.e.*, with the District or with IHC), and a safety concern about having more than 19 players on the ice at a given time.[12] Plaintiffs allege, and the District does not seem to dispute, that an additional team would have no adverse financial impact on the District.[13]

On May 17, 2022, Plaintiffs gave notice to the District (via IHC) that they had assembled enough players (including the interested female students and presumably other students who had not made the roster of the first team), coaches, and a designated separate ice time to roster a second team without any impact to the District. Plaintiffs alleges that this offer was rejected for no specific reason.[14] Plaintiffs also asked the District to allow them to create a school-sponsored team independent of the IHC, and the District declined.[15] The Plaintiffs expressed their concern to the then-acting Superintendent of the District, asking him to ensure that the female students were not being unfairly discriminated by the District.[16] Plaintiffs allege that the Superintendent told them the issue was in the hands of a third-party (presumably the IHC).[17]

---

[12]   *Id*. at ¶¶ 34-39.
[13]   *Id*. at ¶ 45.
[14]   *Id*. at ¶ 40.
[15]   *Id*. at ¶ 41.
[16]   *Id*. at ¶ 44.
[17]   *Id*.

The Plaintiffs then filed a Title IX grievance with Linda Pierce, the District's Title IX Coordinator.[18] While the results of that investigation were pending, it was announced that the District would be adding a high school junior varsity team for accommodate the boys who did not make the high school varsity team.[19]

On August 15, 2022, the District issued the report detailing the findings of the Title IX investigation (the "Title IX Report"), which included the "three-prong analysis" required by Title IX.[20] The Report found that the District was not in compliance with prongs one (substantial proportionality) and two (a history and continuing practice of expanding sports participation opportunities for girls).[21] The Report did find the District to be in compliance with prong three (full and effective accommodation of the athletic interest of the girls enrolled in the school), however.[22] Neither party alleges that, to date, a second co-ed ice hockey team has been rostered, or that any of the Plaintiffs have been added to the roster of the existing team.

Plaintiffs filed suit against the District on August 25, 2022,[23] and then filed the instant Motion for a Preliminary Injunction on August 29, 2022.[24] That Motion

---

[18]  *Id.* at ¶ 45.
[19]  *Id.* at ¶ 48.
[20]  *Id.* at ¶ 51; Ex. Q.
[21]  *Id.*
[22]  *Id.* at ¶¶ 52-56; Ex. Q.
[23]  Doc. 1.
[24]  Docs. 3, 4.

has been fully briefed, oral argument held on November 3, 2022, and the Motion is now ripe for disposition.[25]

## II.    LAW

The United States Court of Appeals for the Third Circuit has established that preliminary injunctive relief is an "extraordinary remedy" that "should be granted only in limited circumstances."[26] In determining whether to grant a request for a preliminary injunction, courts consider four factors: (1) "whether the movant has shown a reasonable probability of success on the merits"; (2) "whether the movant will be irreparably injured by the denial of relief"; (3) "whether granting preliminary relief will result in even greater harm to the nonmoving party"; and (4) "whether granting the preliminary relief will be in the public interest."[27]

Factors three and four, however, are only considered if the "movant meet[s] the threshold for the first two most critical factors: [she] must demonstrate that [she] can win on the merits (which requires a showing significantly better than negligible)" and that "[she] is more likely than not to suffer irreparable harm in the absence of preliminary relief."[28] If the first "gateway" factors are met, then a court "considers the remaining two factors and determines in its sound discretion if all

---

[25]  Docs. 3, 4, 13, 15.

[26]  *Kos. Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citations omitted) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)); *see Philadelphia Vietnam Veterans Mem'l Soc'y v. Philadelphia*, No. 21-1125, 2022 U.S. App. LEXIS 7629, at *5-6 (3d Cir. Mar. 23, 2022).

[27]  *Crissman v. Dover Down Ent. Inc.*, 239 F.3d 357, 364 (3d Cir. 2001).

[28]  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal citations omitted).

6

four factors, taken together, balance in favor or granted the requested preliminary relief."[29]

## III.   ANALYSIS

Plaintiffs' Motion seems to be grounded in their claim brought under the Title IX of the Education Amendments of 1972 ("Title IX"). In their Complaint, Plaintiffs assert a standalone cause of action for "motion for temporary restraining order/preliminary injunction for violations of Title IX"[30] (not the equal protection clause) (emphasis added). In their Motion, Plaintiffs base their argument on likelihood of success on the merits on the fact that they "have laid out, and Defendant has admitted to, *per se* violations of <u>Title IX</u>"[31] (not the equal protection clause) (emphasis added).

In the brief supporting their Motion, Plaintiffs note in one paragraph that the District has violated Plaintiffs' constitutional rights and that "[a] [S]ection 1983 suit based on the Equal Protection Clause <u>is available to</u> [P]laintiffs alleging unconstitutional gender discrimination in schools"[32] (emphasis added). This signals to the Court that Plaintiffs are merely noting that they have an argument and separate claim under the Equal Protection Clause, but that it is not the basis for this Motion. Plaintiffs do not substantively argue that they will succeed on the merits of their

---

[29] *Id.*
[30] Doc. 1 at p. 25.
[31] Doc. 3 at p. 25.
[32] Doc. 4 at p. 17.

Equal Protection claim. And while the District does set forth *Monell* arguments in its opposition brief (presumably for the sake of thoroughness, which the Court appreciates),[33] the overall briefing's predominant focus on Title IX, and Plaintiffs' choice not to substantively argue their Equal Protection claim, does not put the Court in a position to decide the Equal Protection claim's likelihood of the success on the merits for purposes of this Motion.[34] Therefore, the basis for this opinion is Plaintiffs' Title IX claim alone, and in assessing whether to grant Plaintiffs' Motion for injunctive relief, the Court must evaluate Plaintiffs' Title IX claim using the factors discussed above.

### A.    Likelihood of Success on the Merits

Plaintiffs argue that the District has violated Title IX in both its failure to provide an effective accommodation to the female athletes, and in its failure to provide equal treatment to the female athletes.[35] Specifically, Plaintiffs allege that the District has failed each prong of the three-pronged test required for effective accommodation analysis.[36] The District contends that while the Title IX Report

---

[33]  Doc. 13 at pp. 14-17.

[34]  The Court would offer the parties an opportunity to submit additional briefing on the Equal Protection Claim but does not believe it will change the practical outcome that will be set in motion by this opinion, *i.e.*, that the District will be enjoined from violating Title IX and required to provide club ice hockey opportunities for middle school female athletes. However, the parties are permitted to submit letters to the Court, or to request a status conference, should they wish to discuss this topic further.

[35]  Doc. 4 at p. 12.

[36]  *Id*. at pp. 12-13; *see* Office for Civil Rights, Department of Health, Education, and Welfare, *Title IX of the Education Amendments of 1972*; a Policy Interpretation; *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71413 (Dec. 11, 1979) § VII.

indicated that while the District was not in compliance with prongs one and two, it did conclude that the District was in compliance with prong three—and compliance with only one prong is required.[37]

Title IX holds that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"[38] "[A] recipient which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunities for members of both sexes."[39] The Fourteenth Amendment prohibits denying "any person within its jurisdiction the equal protection of the laws."[40] Plaintiffs seeking injunctive relief under Title IX must demonstrate that the alleged discrimination is a failure of "effective accommodation" or "equal treatment" under the statute's subsequent regulations.[41]

Analysis of an "effective accommodation" claim includes a three-pronged test.[42]Because the parties only dispute whether the District is in compliance with prong three of the three-part test governing effective accommodation analysis, the

---

[37]  Doc. 13 at pp. 8-10.
[38]  Doc. 4 at p. 11.
[39]  34 C.F.R. § 106.41(c).
[40]  U.S. CONST. amend. XIV.
[41]  34 C.F.R. § 106.41(c)(1) (effective accommodation); *id*. at (c)(2)-(10) (equal treatment).
[42]  *See Barrett v. W. Chester Univ. of Pa. of the State Sys. of Higher Educ.*, No. 03-CV-4978, 2003 U.S. Dist. LEXIS 21095, at *16 (E.D. Pa. Nov. 12, 2003).

Court will naturally focus on that prong.[43] The third prong measures an educational institution's compliance with Title IX by querying:

> Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of members of that sex have been fully and effectively accommodated by the present program.[44]

Educational institutions satisfy prong three when "the [athletic] interests and abilities of the members of [the underrepresented] sex have been fully and effectively accommodated by the [university's] present program."[45] Facially, this prong requires "a relatively simple assessment of whether there is unmet need in the underrepresented [sex] that rises to a level sufficient to warrant a new team or the upgrading of an existing team."[46] "This is a high standard, however, since the existence of any significant unaccommodated interest and ability in the underrepresented sex will prohibit a finding of prong three satisfaction, even if there is unmet interest and ability in the overrepresented sex."[47]

---

[43] The District notes in its opposition that, technically and using enrollment data from 2021-2022, it complied with prong one as to grades 7-8. However, because the District as a whole is assessed by the Report, and because the Report itself concedes that the District was not in compliance with prongs one and two, the Court finds that Plaintiffs would likely be able to demonstrate noncompliance with prongs one and two according to the Report's own findings and conclusions. Therefore, the Court will focus on prong three.

[44] 1979 Policy Interpretation § VII.C.5.a.

[45] *Id.* at § VII.C.5.a.(3); *Robb v. Lock Haven Univ. of Pa.*, No. 4:17-CV-00964, 2019 U.S. Dist. LEXIS 76762, at *7-8 (M.D. Pa. May 7, 2019).

[46] *Id.*; *Cohen v. Brown University*, 991 F.2d 888, 900 (1st Cir. 1993).

[47] *Robb*, 2019 U.S. Dist. LEXIS, at *7-8 (internal quotations and citations omitted).

The Office for Civil Rights of the Department of Education ("OCR") clarified in 1996 that analysis of prong three asks whether, at the subject educational institution, there exists: (1) "unmet interest in a particular sport;" (2) sufficient ability to sustain a team in the sport;" and (3) "a reasonable expectation of competition for the team."[48] In a Dear Colleague letter dated April 20, 2010, the OCR stated: "If the answer to all three questions is 'Yes,' OCR will find that an institution is not fully and effectively accommodating the interests and abilities of the underrepresented sex and therefore is not in compliance with [prong] three."[49]

This analysis is to guide the determination of "whether the gender imbalance results from impermissible discrimination or merely from the genders' varying degree of interest in sports."[50] It is worth noting that the regulatory landscape has made it unclear as to who bears the burden of proof for prong three, but at least one federal court has maintained that the burden rests with the plaintiff.[51]

The District argues that it has satisfied prong three and quotes from the Title IX Report.[52] The Report details that the District fields "15 teams in 8 sports," where 5 are all-boys, 8 are all-girls, and 2 are co-ed.[53] To support its assertion that that "the

---

[48]  *Id*. at *8.

[49]  Office for Civil Rights, United States Department of Education, *Guidance on Accommodating Students' Athletic Interests and Abilities: Standards for Part Three of the "Three-Part Test"* (Apr. 20, 2010) at p. 4.

[50]  Doc. 4 at p. 5 (citing *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 858 (9th Cir. 2014)).

[51]  *Robb*, 2019 U.S. Dist. LEXIS at *8-9.

[52]  Doc. 13 at pp. 9-10.

[53]  *Id*.

11

offerings are more than sufficient to satisfy the interests of girls in grades 7-8," the Report indicates that there are "[seven] sports [for girls] already offered," which include "unfilled participation opportunities."[54]

The Report then lists the numerous sports where there are more male participants than female participants, concluding: "[T]he District has effectively maxed out its sports offerings for girls and . . . there are no other sports that could be offered in which there is enough interest by the girls at the school to be able to field a team."[55] The District further argues that it accommodated Plaintiffs by permitting them to try out for the middle school ice hockey team; Title IX does not guarantee them a spot on the roster.[56]

The question then before the Court is whether the District has satisfied prong three, and the Court will follow the guidance set forth by the OCR in answering that question, *i.e.*, the Court will go through each of the three questions set forth in the Dear Colleague letter. If the arguments and evidence presented sufficiently demonstrate that all three questions can be answered in the affirmative, then Plaintiffs' Title IX claim is likely to succeed on the merits, and the first factor of the preliminary injunction standard is satisfied.

---

[54] *Id*. at p. 10.
[55] Doc. 13 at p. 10.
[56] *Id*. at pp. 11-12.

### 1.     Unmet Interest in Ice Hockey

The first question is "is there unmet interest in a particular sport?" Plaintiffs argue that the answer to this question is "yes," and the Court agrees. Neither party disputes that there are female students who are interested in playing ice hockey. Plaintiffs argue that this interest is not being met because no female students made the team, and the District has been unwilling to create a second team for the students who did not make the first team (including all interested female athletes). The District argues that the female athletes' interest in the sport was met when they were permitted to try out for the ice hockey team. The District also cites to a number of cases discussing the discretion and flexibility afforded to educational institutions in designing their athletic programs,[57] and the Court does not dispute the holdings of those cases or the proposition that schools should be free to structure their athletic programs thoughtfully and creatively. But that discretion and freedom is not unlimited, and one of those limitations is triggered when the program, in any manner and at any level, violates Title IX.

Merely allowing female athletes to show up for co-ed tryouts is not enough to satisfy Title IX,[58] and it is "not determinative of the question of 'previously limited' athletic opportunities under Title IX."[59] Plaintiffs are correct that the Third Circuit

---

[57]   Doc. 13 at pp. 12-14.
[58]   *Williams v. Sch. Dist. Of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993).
[59]   *Id*.

has held that "athletic opportunities means real opportunities, not illusory ones."[60] Here, the context and outcome of the tryouts are important. Between two separate tryouts, four female students vied to join the co-ed middle school hockey team.[61] Thirty-four students in total tried out.[62] When the final team was rostered, no female students were on this long list, but nineteen male students made the cut.[63] Based on this outcome and the numbers alone, it is clear that there the District was willing to create a large single team with many roster slots, but none of those slots were offered to interested females.

No facts indicate that the District has made any efforts to meet the female students' interest in alternative or comparable ways—*e.g.*, by allowing female students to practice with the team to learn skills, inviting the female students to rotate in filling "alternate" spots, holding workshops or coaching sessions at the ice rink where female students can get time on the ice.[64] Instead, the evidence presented demonstrates that the female students were given no comparable opportunity to play ice hockey at the middle school level, all while the District was aware of the female students' interest.

---

[60]   *Id.* (internal quotations omitted).
[61]   Doc. 1 at ¶¶ 22-26.
[62]   *Id.* at ¶ 22.
[63]   *Id.* at ¶ 26.
[64]   These are only examples contemplated by the Court. Needless to say, the Court is not an expert on the minutia of ice hockey training.

The OCR also sets forth a broad range of indicators to evaluate this question, including "whether a viable team for the underrepresented sex recently was eliminated."[65] This indicator is key in this case because the reason Plaintiffs sought an accommodation from the District is because the local private team that had previously rostered them had recently been disbanded.[66] This supports the Court's finding that there were female students interested in ice hockey, and that the District did not meet their interest. Therefore, this answers  affirmatively that there are female students with an unmet interest in ice hockey.

### 2.    Sufficient Ability to Sustain a Team in Ice Hockey

The second question asks "is there sufficient ability to sustain a team in the sport?" Plaintiffs argue that the answer to this question is also "yes" because "Plaintiffs had enough total players to sustain a team."[67] The District argues that it "has been willing to support the creation of a second middle school team, if feasible," but that it "specifically refutes the logistical reality as claimed."[68]

Be that as it may, the District cannot simultaneously state that it supports creating a second co-ed middle school team that could accommodate the interested female students, while at the same time do nothing when the female students ask for a team to be created. The District cannot claim to be unaware of the fact that

---

[65]   Dear Colleague Letter, pp. 4-5.
[66]   Doc. 1 at ¶ 21.
[67]   Doc. 4 at p. 15.
[68]   Doc. 13 at pp. 8, 18.

such a team would allow these female students to gain athletic skills during a critical time. While the District states that it refutes logistical realities about the situation, those refutations fail in light of the evidence Plaintiffs and their parents set forth demonstrating that they had secured time on the ice, found a coach, and assembled enough players to roster a second team.[69] And the District is certainly capable of creating a second team, as is evidenced by its willingness to create a second team for the junior varsity boys.[70]

Ignoring the female students' stated interest in being accommodated while seeming to relinquish this responsibility to a parent-run booster club is not supportive; it is the opposite. The fact that the District asserts that it is supportive of creating a team to accommodate the interested females, and yet offers no acceptable justification for why is has failed to do so, provides further support for the Court's finding that the answer to this question is also in the affirmative. The District has sufficient ability to sustain a second middle school ice hockey team.

### 3.    Reasonable Expectation of Competition for the Team

The third and final question asks "is there a reasonable expectation of competition for the team?" Relevant to this consideration are "competitive opportunities offered by other schools against which the institution competes" and "competitive opportunities offered by other schools in the institution's geographic

---

[69]   *See* Doc. 1 at ¶ 40.
[70]   *Id*. at ¶ 48.

area, including those offered by schools against which the institution does not now compete."[71] "If the information or documentation compiled by the institution during the assessment process shows that there is sufficient interest and ability to support a new intercollegiate team and a reasonable expectation of intercollegiate competition in the institution's normal competitive region for the team, the institution is under an obligation to create an intercollegiate team within a reasonable period of time in order to comply[.]"[72]

No evidence presented indicates that a second co-ed middle school ice hockey team would be unable to compete in the already-existing club hockey league in which the current middle school ice hockey team competes. Therefore, the answer to this question is also affirmatively that there is a reasonable expectation of competition for a second middle school ice hockey team.

The Court has answered unequivocally each of the three questions posed by the OCR's guidance with respect to prong three of Title IX's three-pronged test. In sum, the District is in violation of Title IX, and Plaintiffs' Title IX claim is likely to succeed on the merits.[73]

---

[71] Dear Colleague Letter at p. 13.
[72] *Id*.
[73] Because the Court finds Plaintiffs' Title IX claim to be successful on the basis of their "effective accommodation" theory, the Court declines to analyze Plaintiffs' additional "equal treatment" arguments under Title IX. *See* Doc. 4 at pp. 16-17.

### B.     Irreparable Harm

Plaintiffs argue that absent injunctive relief, they will suffer irreparable harm by continuing to lose the opportunity to compete, train, and build skills during a formative time for young student athletes.[74] The District argues that Plaintiffs' articulated harm is "completely speculative and insufficient to establish the need for injunctive relief."[75] The Court disagrees with the District and finds that Plaintiffs will suffer irreparable harm absent injunctive intervention by the Court.

The moving party has the burden of proving a "clear showing of immediate irreparable injury."[76] The "requisite feared injury or harm must be irreparable not merely serious or substantial," and "must be of a peculiar nature, so that compensation in money cannot atone for it."[77]

Plaintiffs cite to a number of persuasive cases, which the District seemingly chose not to address or rebut.[78] Those cases are demonstrative of courts' longstanding finding that lost opportunity in the context of student athletics can be considered irreparable harm.[79] Additionally, this Court held in *Beattie v. Line*

---

[74]   *See* Doc. 4 at pp. 19-20.
[75]   Doc. 13 at p. 18.
[76]   *Continental Group. Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal quotations and citation omitted).
[77]   *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977).
[78]   *See* Doc. 4 at pp. 19-20; Doc. 13 at p. 18 (bottom).
[79]   *See* Doc. 4 at pp. 19-20 (citing *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009); *Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 583 (W.D. Pa. 1992), *aff'd* 7 F.3d 332 (3d Cir. 1993)); *Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96 C 6953, 1996 U.S. Dist. LEXIS 17368 (N.D. Ill. Nov. 19, 1996)); *see also Lazor v. Univ. of Connecticut*, 560 F. Supp. 3d 674, 678 (D. Conn. 2021).

*Mountain School District* that a female wrestler denied access to the wrestling team would suffer irreparable harm "because she would miss opportunities to practice and compete," and "there [were] no available opportunities to participate in the sport that [were] of the same frequency and quality as those accompanying the [District's] wrestling program."[80] "These missed opportunities," this Court stated, "would cause [the female athlete] to fall behind in her athletic development and prevent her from competing to her fullest potential in the future, including her aspirations at the collegiate level."[81]

Plaintiffs are female student athletes who seek the opportunity to play ice hockey. Each day that passes further deprives them of that opportunity when they could otherwise be on the ice, learning critical skills. No other form of relief is adequate to remedy this harm, and Plaintiffs have sufficiently demonstrated that there are no available opportunities of similar frequency and quality as the District's club ice hockey teams in their own backyard, especially in light of the fact that the female students' previous team had been disbanded. The Court regrets that the clock has been ticking for Plaintiffs—and this harm has accumulated—since the beginning of the school year, months ago, and that the Plaintiffs have "therefore passed the time when the team would have already begun its regular training."[82] The Court therefore finds that the Plaintiffs will suffer irreparable harm absent injunctive relief.

---

[80] *Beattie v. Line Mt. Sch. Dist.*, 992 F.Supp. 2d 384, 396 (M.D. Pa. 2014).
[81] *Id.*
[82] *Barrett*, 2003 U.S. Dist. LEXIS at *47.

## C.    Balancing of Equities

Because Plaintiffs have satisfied the first two factors, the Court now weighs "potential injury to [the Plaintiffs] if an injunction does not issue" against "the potential injury to [the District] if the injunction is issued."[83] This factor also requires courts to consider whether granting preliminary relief "will result in even greater harm to the nonmoving party."[84]

Plaintiffs argue that an injunction will create "no hardship" for the District while the Plaintiffs continue to be harmed, while the District only states that "the equities in this matter clearly favor denial of [Plaintiffs' Motion]."[85] While this conclusion may be clear to the District, it is not clear to the Court. The District did not present evidence of current harm—or harm that would be caused by injunctive relief—that outweighs Plaintiffs' stated harm of continued missed opportunity to participate in student athletics. In fact, Plaintiffs have demonstrated that they are willing to assist, or completely assume, many if not all responsibilities associated

---

[83]  *Novartis Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

[84]  *Allegheny Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999).

[85]  Doc. 4 at p. 21; Doc. 13 at p. 9. The Court notes that both parties devoted most of their briefing to the first two injunctive relief factors (*i.e.*, likelihood of success on the merits, and a showing or irreparable harm). This is understandable, as these factors are the most important and known as the "gateway factors." However, the District's one-sentence analysis under the balancing of equities factor prods this Court to advise all litigants not to discount the value of the remaining injunctive relief factors, especially in cases—as here—where the Court finds the first two factors to have been satisfied. The balancing of equities and public interest factors are important and warrant complete analysis.

with fielding a second team to accommodate the female students.[86] Consequently, the Court finds that the balance of equities weighs in Plaintiffs' favor.

### D.    Public Interest

The final factor for the Court to consider is whether granting injunctive relief is in the public interest.[87] In the Third Circuit, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."[88]

Here, the public interest lies in enjoining the District from discriminating against Plaintiffs based on their status as female athletes, because "[p]romoting compliance with Title IX serves the public interest"[89] and protecting civil rights is "a purpose that is always in the public interest."[90] Further, the District has not presented any countervailing legal right that should outweigh Plaintiffs' rights to be protected by Title IX. Therefore, the Court finds that granting injunctive relief to Plaintiffs serves the public interest.

## IV.   CONCLUSION

The great ice hockey player Wayne Gretzky famously said that "[y]ou miss 100% of the shots you don't take." His quote assumes that everyone has the

---

[86] *See* Doc. 1 at ¶ 40.
[87] *A.T.&T. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8. (3d Cir. 1994).
[88] *Id.*
[89] *Barrett*, 2003 U.S. Dist. LEXIS at *50-51 (granting motion for injunctive relief and directing reinstatement of women's gymnastics team).
[90] *Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016).

opportunity to play, though, and in this case, the Plaintiffs have not been given the opportunity to which they are afforded under Title IX.[91] For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction is granted. The Court does not require a bond because "complying with the preliminary injunction raises no risk of monetary loss to the defendant."[92]

An appropriate Order follows.

BY THE COURT:

s/ Matthew W. Brann
Matthew W. Brann
Chief United States District Judge

---

[91]  The Court regrets that this matter escalated to the point where judicial intervention and injunctive relief proved necessary. For the sake of the State College community's wellbeing, the Court encourages all players in this case, literally and figuratively, to consider working together in resolving this matter going forward.

[92]  *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).