# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINNET BROOKS, *et al.*,

  Plaintiffs,

v.

STATE COLLEGE AREA SCHOOL
DISTRICT, *et al.*,

  Defendants.

No. 4:22-CV-01335

(Chief Judge Brann)

## MEMORANDUM OPINION

### DECEMBER 18, 2023

## I.   BACKGROUND

In June 2023, Linnet Brooks, Aaron Brooks, Michael Lucy, Elizabeth Yoder, and Megan Abplanalp, suing on behalf of their daughters A.B., R.L. and Q.H., (collectively, "Plaintiffs"), filed a 5-count amended complaint against State College Area School District ("SCASD"), Chrissie Ebeck, Gary Stidsen, and State College Area School District Ice Hockey Club ("IHC").[1] IHC was dismissed from the case.[2]

In June 2023, SCASD filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[3] The motion is now ripe for disposition. It is denied as to Plaintiffs' Title IX and Equal Protection claims and granted with prejudice as to Plaintiffs' remaining claims.

---

[1]   Doc. 43.
[2]   Doc. 71.
[3]   Doc. 47.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[4] and *Ashcroft v. Iqbal*,[5] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[6] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[7]

### B.    Facts Alleged in the Amended Complaint

In essence, this case is about middle school girls who want to play ice hockey, but whose efforts to form a second team have been rejected at every turn. Since the first complaint, the allegations have multiplied, and ongoing animosity between the

---

[4]    550 U.S. 544 (2007).
[5]    556 U.S. 662 (2009).
[6]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[7]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

parties has been incorporated in new allegations of retaliation. Plaintiffs' 57-page amended complaint sets out a lengthy history of the ongoing dispute. The facts alleged in the amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

### 1. The Tryouts

Around 2001, SCASD created a club sports program, existing outside of the Pennsylvania Interscholastic Athletic Association.[8] One such club sports organization, IHC, was formed in 2004.[9] IHC is a parent-run booster club incorporated in Pennsylvania and organized to facilitate SCASD ice hockey teams' interscholastic play.[10] Chrissie Ebeck is IHC's President, and Gary Stidsen is the head coach of its middle school team; Jeff Ebeck was also a coach of the team.[11] Plaintiffs allege that while there was no formal agreement to transfer control of the club programs of the IHC, "it was the intent of SCASD to have no supervisory oversight whatsoever as to the administration or operation of the SCASD ice hockey club teams."[12] Such control was "solely vested in the IHC and the team coaches."[13]

The IHC had accommodated up to two teams of ice hockey players for several years, depending on demand. From 2004 to around 2016, there were one or two

---

[8]  Doc. 42 ¶12.
[9]  *Id.* ¶15.
[10] *Id.* ¶6.
[11] *Id.* ¶¶8-9, 28.
[12] *Id.* ¶18.
[13] *Id.*

middle school ice hockey teams based upon the number of SCASD students trying out; the IHC attempted to accommodate as many students as possible.[14] For the 2021-2022 season, the number of students trying out were less than the number of roster spots, so all students were accepted and only one team was formed.[15]

Linnet Brooks, Aaron Brooks, Michael Lucy, Elizabeth Yoder, and Megan Abplanalp (the "Plaintiff Parents") are the parents and natural guardians of A.B., R.L., and Q.H., (the "Plaintiff Players"), female students enrolled in the SCASD public school system.[16] While A.B. and R.L. had played in a private hockey league, the State College Youth Ice Hockey Association ("SCYIHA"), SCYIHA did not roster a girls' team for the 2022-2023 season.[17] IHC's middle school ice hockey teams could potentially accommodate female athletes, as these teams were co-ed and non-checking.[18] A.B. and R.L.'s parents accordingly notified the IHC around February 2022 that their daughters would like to play on an IHC team for the upcoming year, and therefore, that IHC should make sure that enough middle school teams existed to roster more athletes.[19]

As a result of the tryouts process in April 2022, however, a lengthy feud began concerning whether the IHC was discriminating against female athletes.[20] Thirty-

---

[14]   *Id.* ¶20.
[15]   *Id.* ¶21.
[16]   *Id.* ¶4.
[17]   *Id.* ¶¶22-24.
[18]   *Id.* ¶25.
[19]   *Id.*
[20]   *Id.* ¶26.

four students attended the first tryout on April 12, including four female athletes.[21] Upon the arrival of Q.H. and her mother at the first tryout on April 12, Ebeck refused to give them a copy of the IHC's jersey number selection form, which Plaintiffs allege demonstrates that the outcome of the tryouts was "preordained."[22] The second tryout was held on April 26, 2022, to which three of the four girls to first try out returned.[23] Nineteen boys and none of the girls were rostered to the team.[24]

### 2.    Initial Attempts to Form a Second Team

After the first try out, Plaintiff Parents emailed the middle school ice hockey coaches, Stidsen and Jeff Ebeck, to reiterate the lack of opportunities for female athletes and to point out that there were enough players trying out to roster two middle school teams.[25] Chrissie Ebeck declined the proposal, stating that there was not enough time at the ice hockey rink to accommodate two teams. [26] However, Plaintiffs allege that IHC never actually inquired into available ice time at the rink.[27] Plaintiff Parents hosted a zoom meeting to discuss options to keep their daughters on the ice; Chrissie Ebeck declined an invitation and sent the IHC Treasurer in her place, and IHC Vice President Peter Sides attended in his personal capacity.[28]

---

[21]  *Id.*
[22]  *Id.* ¶27.
[23]  *Id.* ¶35.
[24]  *Id.* ¶37.
[25]  *Id.* ¶28.
[26]  *Id.*
[27]  *Id.*
[28]  *Id.* ¶33.

Rostering a second team appeared feasible, but SCASD and IHC appeared unwilling to do so. As the Plaintiff Parents were told that there was not enough ice time to accommodate a second team, they emailed a representative at the Pegula Ice Arena.[29] She informed them that the ice arena would be willing to accommodate a second team, but someone from IHC would need to initiate and carry through the arrangement.[30] As IHC ordinarily enrolled in the Laurel Mountain Hockey League,[31] IHC vice president Peter Sides asked whether there were any limitations on having a second team.[32] The LMHL president stated that there would be no issue.[33]

Results were posted after the second tryout on April 27, and as no girls made the team, Plaintiffs again attempted to explore rostering a second team.[34] Plaintiff Parents contacted IHC on April 27 to ask about accommodating the female athletes, since of the three State College teams, no girls over the age of 12 were rostered.[35] They reached out again on April 28 to ask about a second team rostering the female athletes, which Ebeck again rejected due to a lack of ice time; she stated that the IHC's decision to roster only one middle school team would stand.[36]

---

[29]   *Id.* ¶29; Email Exchange between Aaron Brooks and Deborah Campbell, Doc. 43-7.
[30]   *Id.*
[31]   Doc. 43 ¶¶16-17.
[32]   *Id.* ¶30.
[33]   *Id.*; Email Exchange between Jason Harvey and Peter Sides, Doc. 43-8.
[34]   *Id.* ¶37.
[35]   *Id.* ¶39; Email exchange between Aaron Brooks and Cami Wible, Doc. 43-9.
[36]   Doc. 43 ¶40; Email exchange between Aaron Brooks and Chrissie Ebeck, Doc. 43-10.

### 3.      Parent Plaintiffs Seek Intervention to Form a Second Team

While continuing their attempts to work with IHC and SCASD, Plaintiff Parents sought intervention through SCASD, the Centre County Court of Common Pleas, SCASD's solicitor, SCASD's superintendent, SCASD's Title IX Officer, SCASD's school board, and finally, through this Court.

On April 29, 2022, Plaintiff Parents sought the intervention of the SCASD school system, and explained the situation in an email to the SCASD Athletic Director, Chris Weakland, its Diversity and Inclusivity officer, Dr. Seria Chatters, and its ice hockey academic advisor, Andrew Wilson.[37] According to plaintiffs, Weakland and Wilson met around April 29 and confirmed that rostering a second middle school team would have no financial impact on SCASD.[38] At a May 3 IHC Board meeting, the Board, including Weakland, voted that there should only be one middle school ice hockey team.[39]

Plaintiffs then filed suit on May 12, 2022, requesting an injunction against IHC in the Centre County Court of Common Pleas.[40] As SCASD had represented that IHC had total control over the program, Plaintiffs provided SCASD with an advance copy of the injunction in the hopes of encouraging a dialogue.[41] SCASD,

---

[37]  *Id.* ¶42; Email exchange between Aaron Brooks and Chris Weakland, 43-11.
[38]  Doc. 43 ¶43.
[39]  *Id.* ¶45; May 18, 2022 SCASD Ice Hockey Club meeting minutes with Gary Stidsen, Doc. 43-13.
[40]  *Id.* ¶47.
[41]  *Id.*

however, did not inform Plaintiffs that it actually did maintain authority over IHC's decisions.[42] On May 16, 2022, Ebeck contacted Pegula's rink manager, who stated that the rink could accommodate two middle school teams.[43] According to Plaintiffs, the "30/30/30" method[44] of sharing the rink suggested by Pegula's manager is utilized by "[a]lmost all youth teams practicing at Pegula" and is endorsed by U.S.A. Hockey as a "safe and effective use of limited ice time."[45] Ebeck responded to the rink manager that "[t]he board is still not comfortable with the teams sharing the ice, even for 30 minutes," due to various purported safety issues.[46]

Despite this communication, IHC did not relay to Plaintiffs that Pegula had offered an accommodation.[47] Instead, IHC stated that "any players who were cut from the team would need to travel to Altoona, a city more than 40 miles from Pegula, and play for a private Catholic school, Bishop Guilfoyle."[48] Plaintiffs further allege that Ebeck omitted Pegula's proposed accommodation when discussing the Bishop Guilfoyle option with the LMHL.[49] Plaintiffs responded that as one of the girls identified as gay, they had concerns playing for a private religious institution;

---

[42] *Id.*

[43] *Id.* ¶¶48-49; Email exchange between Bryan Lee and Chrissie Ebeck, Doc. 43-13.

[44] For a total practice time of 90 minutes, the 30/30/30 method allows each team to utilize the rink for one hour. 30 minutes are used by one team alone; the next 30 are used by both teams; and the final 30 are used by the other team alone. *Id.*

[45] Doc. 43 ¶¶50, 57; U.S.A. Hockey 14u practice planner, Doc. 43-14.

[46] Doc. 43 ¶¶ 50-51; Doc. 43-13.

[47] Doc. 43 ¶52.

[48] *Id.*¶¶ 52, 190-91.

[49] *Id.* ¶53.

SCASD's Title IX coordinator and school board dismissed these concerns.[50] IHC continued to claim that it could not roster a second team due to safety concerns related to both teams practicing on the ice at the same time.[51]

Plaintiffs allege that several circumstances demonstrate the pretextual nature of SCASD and IHC's reasons to reject a second team. Plaintiffs state that SCASD varsity and middle school teams had previously participated in split ice practices in 2021 with Gary Stidsen as head coach, and Stidsen and Ebeck's sons had participated in split ice practices as part of their private club team practices.[52] Likewise, SCASD and IHC did not disclose to Plaintiffs that the LMHL's "flex player" program only limited the number of players who could suit up for a game, but did not actually limit the number of players who could be on a team.[53] Plaintiffs therefore allege that "Defendants used misinformation/disinformation of a non-existent limit of roster spots to stir controversy and build opposition to accommodating female athletes . . . Defendants knew that they could have included the disenfranchised girls in practice and to fill empty game day slots."[54]

Despite believing that the alleged safety concerns were false, Plaintiffs then provided notice on May 17, 2022, that they had found a completely separate ice time

---

[50]   *Id.* ¶¶54-56.
[51]   *Id.* ¶57.
[52]   *Id.* ¶58.
[53]   *Id.* ¶60.
[54]   *Id.* ¶¶60-61.

to roster a second team without any impact to the IHC.[55] The IHC rejected this proposal as well.[56] Plaintiffs then gave notice that SCYIHA was willing to split its ice time between the proposed second SCASD team and a private SCYIHA team.[57] IHC rejected this proposal, too.[58]

On May 18, 2022, Stidsen and Ebeck again met to discuss Plaintiffs' insistence to form a second team.[59] Plaintiffs attach Ebeck's meeting notes, which restate the safety concerns of shared practice time, allege a "concern w/ skill level," and further state a "concern for mental well-being" of the members of the second team: "will be 'crushed' in games[;] constantly losing will defeat them[;] doesn't see the benefit for the kids in rostering 2nd team."[60] Again faced with IHC's opposition, Plaintiffs asked SCASD's Solicitor, Scott Etter, for permission to roster a second team independently from IHC, which was denied.[61]

Several further developments occurred at a Centre County Court of Common Pleas hearing on May 27, 2023. Plaintiffs learned that SCASD retained some level of authority over the IHC,[62] and Ebeck maintained in her testimony that IHC denied Plaintiffs' request to form a second team because "Pegula would not 'guarantee' ice

---

[55] *Id.* ¶62.
[56] *Id.*
[57] *Id.* ¶63.
[58] *Id.*
[59] *Id.* ¶65; May 18, 2022 SCASD Ice Hockey Club meeting minutes with Gary Stidsen, Doc. 43-15.
[60] *Id.*
[61] Doc. 43 ¶67.
[62] *Id.* ¶¶69-70.

time for two teams."[63] Andrew Wilson, SCASD's academic advisor to the IHC since 2001, also testified on behalf of the Plaintiffs' request to form a second team; following this hearing, Wilson was removed as the IHC's Academic Advisor and his stipend was withheld by SCASD.[64]

Plaintiffs then contacted SCASD's superintendent, Curtis Johnson, to raise their discrimination complaint.[65] Johnson responded that once a club is controlled by a third-party corporation, SCASD is no longer responsible to protect the rights of its students during club activities, and therefore SCASD is not required to protect students from discrimination within those clubs.[66]

### 4.    Title IX Complaint

Following Johnson's statement, the Plaintiffs contacted Linda Pierce, SCASD's Title IX coordinator, who concurred.[67] According to Plaintiffs, she "held the belief that there is no difference in try-outs where girls had to compete against other girls for roster spots, and try-outs where girls had to compete with boys. If a girl did not make a team when competing against boys, she just needed to try harder next time."[68] This "lack of understanding of basic biology," Plaintiffs maintain,

---

[63]   *Id.* ¶¶ 71-73; Doc. 43-13.
[64]   Doc. 43 ¶74.
[65]   *Id.* ¶75.
[66]   *Id.*
[67]   *Id.* ¶77.
[68]   *Id.*

"underscores the reasons why SCASD has a 19% gender participation gap in PIAA sports and a 75% participation gap in club sports."[69]

On June 2, 2022, Plaintiff Parents filed a Title IX grievance with Pierce, who held the position that "as long as the females had an opportunity to try out for the co-ed team, the Title IX requirements were fully met."[70] Nevertheless, she informed Plaintiffs that the investigation would be completed between June 30 and July 11, 2022.[71] Pierce's August 15, 2022 report concluded that SCASD had not violated Title IX.[72] Despite the report's conclusion, it found that SCASD was not in compliance with each prong of Title IX's three-pronged accommodation test.[73]

In her third prong analysis, Pierce found that SCASD did not need to consider providing more opportunities for female student athletes because "the District has effectively maxed out its sports offerings for girls and [] there are no other sports that could be offered in which there is enough interest by the girls at the school to be able to field a team."[74] Plaintiffs set out fourteen alleged errors contained in the Title IX report, including excluding all of its club sports in its analysis.[75] SCASD's sports participation numbers, supplied to the Commonwealth of Pennsylvania in October of 2022, allegedly revealed a participation gap more egregious than the gap

---

[69]   Id. ¶79.
[70]   Id. ¶80.
[71]   Id. ¶81.
[72]   Id. ¶91; SCASD Title IX grievance report, Doc. 43-21.
[73]   Doc. 43 ¶¶93-97; SCASD Title IX grievance report, Doc. 43-21.
[74]   Doc. 43 ¶ 95; Doc. 43-21 at 7.
[75]   Doc. 43 ¶95.

disclosed in the Title IX grievance response.[76] This consisted of a 14.6% rather than a 9.471% overall gap, and a 19% rather than a 12.191% high school gap.[77]

### 5.    Retaliation Prior to Formation of Second Team

Starting prior to Plaintiffs' Title IX complaint and extending until after this Court's Order,[78] a series of allegedly retaliatory conduct was directed towards Plaintiffs and those who supported their efforts. Plaintiffs present statements from IHC officials and parents which allegedly demonstrate their bias towards Plaintiffs. On June 1, 2022, IHC Secretary Cami Wimble sent the following email to Andrew Wilson, who had testified in Plaintiffs' favor at the state court hearing:

> I do not even know where to begin with this email. We have been informed by our attorney that SCASD will be pulling their sponsorship of our program. The heartache that I feel for the future kids who will never be allowed to play hockey and earn a letter is staggering in its intensity. You, personally, should be ashamed of the role that you have played in the ultimate demise of this program. You know that there has never been any discrimination in our program. We have always welcomed girls into the program. I hope that the pain that you will be causing to countless young people has been worth it.
>
> There are no words to express the disgust that I feel. I will be directing all kids and families to you so that you can answer to them.[79]

Simultaneously, parents of IHC students began spreading the "false rumor" that Plaintiffs' actions would end the ice hockey team on social media,[80] while Ebeck

---

[76]  *Id.* ¶99.
[77]  *Id.*
[78]  Doc. 28.
[79]  *Id.* ¶82; Email exchange from Cami Wible to Andrew Wilson, Doc. 43-17.
[80]  *Id.* ¶83; Facebook post by first middle school hockey team parent, Doc. 43-18.

stated in an email to IHC and LMHL personnel that Plaintiff Parent Aaron Brooks is "nobody" and that his daughter A.B. was "identified as a safety concern on the ice due to their significant lack of skill."[81]

While the Title IX complaint was pending, Plaintiffs notified the SCASD school board of the situation and again requested dialogue to resolve it; the Board refused to engage in any dialogue and endorsed IHC's conduct.[82] On July 27, 2022, Plaintiff Parents inquired about the Title IX investigation, and SCASD responded that it had not been completed because it was performing a "financial impact analysis to investigate the cost associated with expanding the SCASD ice hockey club program to accommodate the female middle school athletes," despite its alleged knowledge that adding a second team would incur no cost.[83] On the same day, SCASD announced that the IHC would add a high school Junior Varsity team (the "JV Team"), made up of eight freshman boys who did not make the high school varsity team.[84] No financial impact analysis was conducted to investigate the costs of the Junior Varsity team; it was "added with no questions asked."[85]

SCASD allegedly knew that "time was of the essence" due to the need to schedule ice time, with practices starting at the end of August and games beginning

---

[81]  Email exchange between Chrissie Ebeck and Jason Harvey, Doc. 43-19.
[82]  Doc. 43 ¶85; Email exchange between Linnet Brooks, and Caroline Crevoceur, Doc. 43-20.
[83]  Doc. 43 ¶86.
[84]  *Id.* ¶¶87-88.
[85]  *Id.* ¶¶ 89, 101.

in October.[86] Yet it spent seventy-five days on the financial impact investigation, in what Plaintiffs allege was a "brazen attempt to run out the clock."[87]

In August 2022, Plaintiffs filed a Motion for Temporary Restraining Order with this Court.[88] I issued an Order in favor of Plaintiffs.[89] The Order enjoined SCASD from taking any further action that would preclude Plaintiffs' participation in IHC's program; enjoined SCASD from relinquishing its Title IX responsibilities to parent-run booster club organizations like IHC; required SCASD to take measures to ensure that Plaintiff Players are rostered on an ice hockey team; cease efforts to block Plaintiffs' attempts to create a second team; and take action to remediate any harm caused by its actions.[90] On December 3, 2022, the Centre Daily Times published an article regarding this Court's Order.[91] An IHC team member subsequently sent an all-team snapchat group message displaying the article, superimposing the words: "They js aren't good [crying emoji]."[92] A second IHC member added: "fr they cry babys," and shared the post with Plaintiff Players Q.H.[93]

These antics led to yet another dispute and triggered yet another series of alleged retaliatory acts. As the father of the instigating boy is an IHC Board member,

---

86  *Id.* ¶90.
87  *Id.* ¶100.
88  *Id.* ¶103; First Motion for Temporary Restraining Order, Doc. 3.
89  Doc. 28.
90  *Id.*
91  Doc. 43 ¶106.
92  *Id.* ¶107; Snap Chat message from 1st middle school team boys directed at Plaintiffs, Doc. 43-22.
93  *Id.*; Doc. 43 ¶108.

Plaintiffs contacted him about the message and explained how it was received by Q.H.[94] Plaintiffs offered to allow the boy to privately apologize to the girls over the message, along with requesting a team meeting to discuss Title IX and the importance of the Court's Order.[95] Plaintiffs had the same conversation with the father of a second boy, who forwarded the message to Q.H.[96] Both fathers agreed to the private apology, and IHC and SCASD were notified of the incident.[97]

Both the IHC and SCASD's bullying standards include the cyberbullying conduct.[98] Although SCASD's normal bullying policy is to initiate an investigation within 20 school days and disclose the findings to the complainant, SCASD refused to disclose any findings and never contacted the complainant girls during the investigation.[99] After 150 days and several demands, SCASD disclosed the report, in which Linda Pierce and the IHC's SafeSport coordinator determined that no bullying had taken place.[100] No apology was given by either student.[101]

Plaintiffs further contend that the agreement to get the girls on the ice as soon as possible was rescinded due to this bullying complaint.[102] For an additional 83

---

[94] *Id.* ¶109.
[95] *Id.* ¶110.
[96] *Id.* ¶111.
[97] *Id.* ¶112-113.
[98] *Id.* ¶¶114, 115-118; SafeSport bullying flyer, Doc. 43-23.
[99] *Id.* ¶120.
[100] *Id.* ¶121.
[101] *Id.* ¶123.
[102] *Id.* ¶124.

days, the Plaintiff Players "did not touch the ice as part of a team."[103] Plaintiffs further allege that "[a]t a meeting [with] prospective second middle school team parents, attended by Linda Pierce, Scott Etter, and Chrissie Ebeck, Linda Pierce admitted that SCASD never intended on complying with the December 1, 2022 Order which required that Plaintiff girls be rostered to a team."[104]

At a January 17, 2023 meeting, Pierce stated that while any student on a second team would become members of the IHC, she doubted that a second team would be formed due to the low number of parents in attendance.[105] Plaintiffs allege that Defendants intentionally discouraged interest in a second team by advertising "exorbitant costs and early morning practice times."[106] On January 5, 2023, SCASD emailed its students about the second team, advertising a cost of "$1,150 and up" to join and a practice time on Tuesday mornings at 6:20 A.M.[107]

Plaintiffs contacted SCASD stating both that the cost should be much lower, and that as Title IX requires practice times to be equally convenient or inconvenient for both teams, the second team either share the first team's 6:45 p.m. ice time or alternate ice times;[108] SCASD did not respond.[109] In a January 24, 2023 email,

---

[103] *Id.* ¶125.
[104] *Id.* ¶126.
[105] *Id.* ¶127.
[106] *Id.* ¶128.
[107] *Id.* ¶129; Doc. Email from SCASD to parents who may be interested in ice hockey for their students, 43-24.
[108] Doc. 43 ¶131.
[109] *Id.*

SCASD listed the price as $300, yet stated that the second team was a girls' only rather than a co-ed team; several parents expressed confusion as to whether the team would allow boys.[110] On that same day, the IHC Team Manager for the middle school's first team informed Plaintiffs: "no one will ever play with your daughters again. I guarantee you that none of our sons will ever sit on a bench with [A.B.]."[111]

### 6.    Retaliation After Formation of Second Team

Tryouts for the second middle school ice hockey team were finally held on January 26, 2023;[112] 14 students attended tryouts, and 13 joined the team.[113] Despite the second middle school ice hockey team finally being formed, petty antics continued. On January 28, Defendants closed coaching applications to the second team without giving notice outside of the IHC, and Coach Jeff Ebeck, who was also a SCYIHA board member, attempted to remove Plaintiff Parents Linnet and Aaron Brooks from their SCYIHA volunteer positions.[114] IHC further vested all authority over the second team in the IHC and Chrissie Ebeck.[115]

After tryouts, Defendants began referring to the team as a "middle school developmental program."[116] Due to the contentious dynamics between students,

---

[110] *Id.* ¶¶132-33' Email from SCASD to parents who may be interested in ice hockey for their students, Doc. 43-25.
[111] *Id.* ¶134.
[112] *Id.* ¶135.
[113] *Id.* ¶136.
[114] *Id.* ¶139-40.
[115] *Id.* ¶142.
[116] *Id.* ¶147.

Plaintiffs and other parents of second team athletes requested that Defendants simply call the second team a "team."[117] Defendants momentarily complied in February 2023 by calling the second team a "team" and inviting its team members to the end-of-season team banquet.[118] Yet Superintendent Johnson, Pierce, and the School Board continued to call the second team "developmental," and the IHC rostered it with USA hockey as the "SCASD Developmental Program."[119] Plaintiffs and other parents again requested that Defendants call the second team a "team," at which point they began referring to it as a "supplemental team."[120]

Defendants subsequently stripped the second team members' parents of their IHC memberships because of their complaints, precluding them from nominating or voting for IHC board members or attending its annual meeting.[121] In another alleged retaliatory act, Defendants rescinded second team members' invitations to IHC's end-of-season banquet.[122] The banquet was held in March 2023 with the "intentional exclusion" of the second team.[123] As a result, second team members began avoiding first team members at school to avoid being bullied.[124]

---

[117] *Id.* ¶138.
[118] *Id.* ¶141.
[119] *Id.* ¶143.
[120] *Id.* ¶144.
[121] *Id.* ¶145-46.
[122] *Id.* ¶147-48.
[123] *Id.* ¶151.
[124] *Id.* ¶152.

IHC further refused Plaintiffs' request to advertise the second team's sole scrimmage, even though it had advertised all first team games.[125] Parent Plaintiffs and third-party parents made social media posts in celebration of a narrow 3-2 loss at the scrimmage.[126] On that same day Pierce demanded that the second team parents remove these posts.[127] Ebeck also contacted a privately-run SCASD parents' Facebook page and demanded that the moderators remove Plaintiffs' post advertising the game.[128] To date, SCASD has refused to acknowledge deficiencies in its ice hockey program, make public any plans to accommodate female athletes, or field more than one team in the LMHL.[129]

### C.    Analysis

#### 1.    Negligent Hiring, Training, Retention, Supervision, and Punitive Damages

Counts Three and Four request damages for SCASD's alleged negligent hiring, training, retention, and/or supervision of Linda Pierce and Gary Stidsen. However, each of these claims is barred by the Political Subdivision Tort Claims Act ("PSTCA"). The PSTCA codifies municipal bodies' sovereign immunity under Pennsylvania state law.[130] It bars any state tort claims against municipal bodies such

---

[125] *Id.* ¶153.
[126] *Id.* ¶157; Facebook post by Linnet Brooks regarding second middle school team, Doc. 43-27.
[127] Doc. 43, ¶¶158-59.
[128] *Id.* ¶159.
[129] *Id.* ¶163.
[130] *Reed v. Mount Carmel Area Sch. Dist.*, No. 4:23-CV-00890, 2023 U.S. Dist. LEXIS 178523, at *12-13 (M.D. Pa. Oct. 3, 2023).

as SCASD unless those claims fall within one of nine narrowly defined waivers of immunity.[131] As the negligence claims implicate none of these categories, they are statutorily barred and dismissed with prejudice as against SCASD.

Count Five requests punitive damages against all Defendants, yet no surviving cause of action would allow punitive damages against SCASD. Punitive damages are not recoverable under Title IX.[132] Nor are they recoverable against a municipal entity under 42 U.S.C. § 1983.[133] And Plaintiffs' state law claims against SCASD are dismissed with prejudice. Therefore, Count Five of the amended complaint is also dismissed with prejudice against SCASD.

### 2.    Title IX

In Count I, Plaintiffs allege that SCASD has violated Title IX both through sex discrimination and through retaliation. SCASD does not contest Plaintiffs' Title IX sex discrimination or retaliation claims themselves. Instead, SCASD contends that Plaintiffs have failed to plead a Title IX claim because "Plaintiffs fail to allege with any degree of specificity how the District's alleged Title IX violations caused them to suffer 'economic damages.'"[134]

---

[131] 42 Pa.C.S. § 8541 (LEXIS 2023). These nine waivers pertain to vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; care, custody or control of animals; and sexual abuse. 42 Pa.C.S. § 8541(b)(1)-(9) (LEXIS 2023).

[132] *Barnes v. Gorman*, 536 U.S. 181, 186-87 (2002).

[133] *Doe v. Cnty of Centre*, 242 F.3d 437, 455-56 (3d Cir. 2001); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1982).

[134] Doc. 48 at 5.

Both parties brief whether Plaintiffs have alleged economic damages.[135] Yet neither addresses why, at this stage of the litigation, the question matters at all. Failure to state a claim under Rule 12(b)(6) requires either that the plaintiff has not plausibly alleged the cause of action based on its essential elements,[136] or that an affirmative defense is apparent on the face of the complaint under the "Third Circuit Rule."[137] A motion to dismiss is about a plaintiff's right, not his remedy.[138]

And a Title IX claim for sex discrimination only requires the plaintiff to plead "(1) that he or she was subjected to discrimination in an educational program, (2) that the program receives federal assistance, and (3) that the discrimination was on the basis of sex."[139] None of those elements require alleging some kind of economic injury. There is no need to rule on what kind of damages are available on a motion to dismiss when the claim itself is plausibly alleged. "These matters are more appropriately handled at the summary judgment stage *at the earliest*."[140]

The only remaining significance damages could have is to Plaintiffs' standing. Such a complaint would fall under Rule 12(b)(1) rather than 12(b)(6), however, as

---

[135]   Doc. 48 at 5-6; Doc. 65 at 7-10; Doc. 67 at 2-7.

[136]   *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). This does not require that the plaintiff establish a prima facia case. *Id.* at 788-89.

[137]   *Lupian v. Joseph Cory Holdings, LLC*, 905 F.3d 127, 130 (3d Cir. 2018).

[138]   *See Childs v. Fitness Int'l*, No. 2:22-cv-05196-JDW, 2023 U.S. Dist. LEXIS 88780, at *13 (E.D. Pa. May 22, 2023) ("Federal Rule Of Civil Procedure 12(b)(6) applies to claims, not remedies.").

[139]   *A.H. v. Minersville Area Sch. Dist.*, 290 F.Supp.3d 321, 326 (M.D. Pa. 2017) (quoting *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 295 (W.D. Pa. 2017)).

[140]   *Chaitram v. Penn Medicine-Princeton Med. Ctr.*, No. 21-17583(MAS)(TJB), 2022 U.S. Dist. LEXIS 203676, at *7 (D. N.J. Nov. 8, 2022).

standing is a jurisdictional requirement for federal courts.[141] Under Article III of the United States Constitution, the federal judicial power is limited to "Cases" and "Controversies."[142] Such a case or controversy only exists if a plaintiff has standing. "The standing inquiry . . . focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."[143] "To establish standing, a plaintiff must show [1] an injury in fact [2] caused by the defendant and [3] redressable by a court order."[144]

"On a motion to dismiss, a plaintiff need only plead 'that there is a "substantial likelihood" that the relief requested will redress the injury claimed.'"[145] "In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim."[146] "With respect to 12(b)(1) motions in particular, '[t]he plaintiff must assert facts that affirmatively and plausibly suggest

---

[141] *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.").

[142] U.S. Const. art. iii.

[143] *Constitution Party of Pa v. Aichele*, 757 F.3d 357, 360 (3d Cir. 2014) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

[144] *United States v. Texas*, 143 S.Ct. 1964, 1969 (2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[145] *Lac Du Flambeau Band v. Norton*, 422 F.3d 490, 501 (7th Cir. 2005) (quoting *Duke Power Co. v. Carolina Envtl Study Grp., Inc.*, 438 U.S. 59, 75 n.19 (1984)).

[146] *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'"[147]

Of the three required standing elements, "the injury-in-fact element is often determinative."[148] An injury in fact is plainly established by the denial of educational benefits undergirding the Plaintiffs' Title IX claim, at minimum including the lack of access to a second middle school ice hockey team.  The allegations plainly trace this injury to SCASD's conduct, especially because it cannot delegate its Title IX responsibilities to IHC.

SCASD's objections may be directed towards redressability. However, redressability considers "the causal connection between the alleged injury and the judicial relief requested."[149] "Redressability does not require that the plaintiff actually be entitled to the relief sought; it is enough that the requested relief, if granted, would redress the plaintiff's injury."[150] The inquiry starts and ends with Plaintiffs' request for compensatory economic damages to remedy their denial of educational benefits under Title IX. A request for compensatory damages necessarily establishes the redressability component of standing.[151] Claiming a lack

---

[147] *Id.* at 244 (quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2009)).

[148] *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009).

[149] *Allen v. Wright*, 468 U.S. 737, 753, n.10 (1984).

[150] 15 MOORE'S FEDERAL PRACTICE - CIVIL § 101.42 (2023).

[151] *See Spring Pharm., LLC v. Retrophin, Inc.*, No. 18-4553, 2019 U.S. Dist. LEXIS 213901, at *10 (E.D. Pa. Dec. 11, 2019) ("It is well-established that money damages redress injuries-in-fact and, thus, satisfy the redressability requirement."); *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F.Supp. 2d 504, 512 (E.D. Pa. 2012) ("[M]oney damages . . . [are] a 'very conventional remedy' that 'would do much to redress their injuries.'").

of standing because a complaint's factual allegations do not support the requested remedies confuses standing with the merits.[152] Standing "in no way depends upon the merits of the [claim]."[153]

Finally, the parties dispute whether the Plaintiff Parents have standing. This implicates statutory standing, which looks at the "zone of interests" protected by the statute rather than implicating the Court's subject matter jurisdiction.[154] Title IX standing extends only to "(i) employees of an education program or activity . . . and (ii) those who are denied access to an 'education program or activity."[155] But it is well-settled that "[p]arents of a student whose rights were allegedly violated do not have standing to assert personal claims under Title IX, but do have standing to assert claims on the student's behalf."[156] So there is no reason to dismiss Parent Plaintiffs.

In sum, this Court can perceive no hurdle at the motion to dismiss stage imposing a "plausibility" requirement on the factual basis underpinning Plaintiffs' Title IX economic damages. Damages are not an element of the claim itself; neither

---

[152] *See, e.g.*, *Cranpark, Inc. v. Rogers Grp. Inc.*, 821 F.3d 723, 731 (6th Cir. 2016); *Norton*, 422 F.3d at 501-502; *Salmon Spawning & Recovery Alliance v. United States Customs & Border Prot.*, 550 F.3d 1121, 1130-31 (Fed. Cir. 2008).

[153] *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989).

[154] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[155] *Oldham v. Pa. State Univ.*, No. 4:20-CV-02364, 2022 U.S. Dist. LEXIS 87272, at *45 (M.D. Pa. May 13, 2022) (quoting *Conviser v. DePaul Univ.*, 532 F.Supp. 3d 581, 591 (N.D. Ill. 2021)). For this reason, the claim that parents' membership rights in IHC were revoked without due process is outside of Title IX's purview. *See also Colombo v. Bd. of Educ. For the Clifton Sch. Dist.*, No. 11:cv-785, 2016 U.S. Dist. LEXIS 150373, at *24 (D. N.J. Oct. 31, 2016) (citing *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1009 n.4 (5th Cir. 1996)).

[156] *MDB v. Punxsutawney Christian Sch.*, 386 F.Supp. 3d 565 (W.D. Pa. 2019).

the injury in fact nor causation requirements of standing require showing economic damages; and redressability does not address the legal merits of the basis for damages itself. Nor is there any basis to dismiss Parent Plaintiffs from the suit. Accordingly, SCASD's motion to dismiss Plaintiffs' Title IX claim is denied.

### D.    Section 1983 Equal Protection Claim

The majority of the parties' briefing addresses Count II of the amended complaint, which through 42 U.S.C. § 1983, alleges that SCASD has violated the Equal Protection Clause to the Fourteenth Amendment of the United States Constitution.[157]

### 1.    Section 1983 Liability

Section 1983 provides a procedural vehicle for private plaintiffs to enforce the Constitution when they suffer violations under color of state law.[158] The first hurdle to a Section 1983 claim against a municipality is ordinarily to show that "the constitutional deprivation was caused by a person acting under state law."[159] As set out in *Monell v. New York Department of Social Services*, a municipal body is a "person" who can be liable under Section 1983.[160] But a municipality can only be liable for its own actions; it cannot be vicariously liable for the actions of its employees. A municipal body acts through "a policy statement, ordinance,

---

[157] Doc. 43 at 49.
[158] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).
[159] *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).
[160] 436 U.S. 658, 690 (1978).

regulation, or decision officially adopted and promulgated by that body's officers."[161] This includes unconstitutional practices which are "so permanent and well settled as to constitute a custom or usage with the force of law,"[162] as well as acts by the municipal body itself,[163] and a failure to train demonstrating "deliberate indifference" towards the constitutional violations caused by its employees.[164]

While this Court held that Title IX prohibits SCASD from delegating its responsibilities to IHC,[165] it has not yet held that the IHC is a state actor for purposes of Plaintiffs' Equal Protection Claim.[166] Yet SCASD no longer seems to contest whether there is any separation between IHC and SCASD. Nor does it contest whether SCASD had notice of any alleged violation. Accordingly, for purposes of this motion the Court focuses only on the merits of whether Plaintiffs allege a violation of their constitutional rights under the Equal Protection Clause.

### 2. Equal Protection Clause

#### a. Legal Standard

The Equal Protection Clause to the United States Constitution prohibits "any State" from "deny[ing] to any person within its jurisdiction the equal protection of

---

[161] *Id.*

[162] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117 (1988).

[163] *See Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (quoting *Bielvicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

[164] *Reitz v. City of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

[165] *See* Doc. 28 ("The District is enjoined from relinquishing any of its Title IX responsibilities to any parent-run booster club organizations.").

[166] Notably, however, the Centre County Court of Common Pleas did find this to be adequately alleged in its earlier opinion. Doc. 46-1 at 92-94.

the laws."[167] Under the Equal Protection Clause, sex-based classifications are inherently suspect and trigger intermediate scrutiny, meaning that the classification must be "substantially related to an important governmental objective."[168] "Sex discrimination at school . . . violates Equal Protection."[169] A plaintiff alleging sex discrimination in violation of the Equal Protection Clause must plead "(1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex."[170]

There is some judicial confusion over whether a complaint must allege facts showing a similarly situated comparator and related instances of differential treatment to survive dismissal.[171] This Court takes the approach set forth in *Perano v. Township of Tilden*: "At the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of . . . similarly situated parties."[172] As to the additional factual allegations included in Plaintiffs' brief in opposition, however, it is "axiomatic that the complaint may not be amended by the briefs in

---

[167] U.S. Const. Amend. xiv.

[168] *Clark v. Jeter*, 486 U.S. 456, 461 (1988). However, the parties never reach this inquiry, so the Court only discusses whether discrimination has been plausibly alleged.

[169] *Doe v. N. Penn Sch. Dist.*, 636 F.Supp.3d 519, 533 (E.D. Pa. 2022); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (holding that a student may sue for sex discrimination at school under both Title IX and the Equal Protection clause through Section 1983).

[170] *Johnston v. Univ. of Pittsburgh of the Commonwealth Sys.*, 97 F.Supp.3d 657, 667 (W.D. Pa. 2015) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990)).

[171] *Compare Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) *and Shkedi v. City of Scranton*, No. 3:CV-14-2069, 2015 U.S. Dist. LEXIS 43122, at *24 (M.D. Pa. Apr. 1, 2015) *with Perano v. Twp. of Tilden*, 423 F.App'x 234, 238 (3d Cir. 2011) (unpublished) *and Campbell v. Conroy*, 55 F.Supp.3d 750, 765 (W.D. Pa. 2014).

[172] 423 F.App'x at 238.

opposition to a motion to dismiss."[173] These additional allegations will therefore not be considered.

### b.   Comparator Analysis

"The failure to identify similarly situated persons dooms an equal-protection claim."[174] Although "[p]ersons are similarly situated under the Equal Protection Clause when they are *alike* in all relevant respects,"[175] "the law in the third circuit does not require [the plaintiff] to show that the [comparators] are *identical* in all relevant respects."[176] Still, an equal protection claim must allege more than "broad generalities" in identifying a comparator.[177]

Here, members of the first team and JV team are similarly situated to the second team in relation to different harms. Both comparators are analogous to the teams in *Thomas v. University of Pittsburgh*.[178] In *Thomas*, a magistrate judge found it plausible that a female athlete on one university sports team who had been suspended after being charged with assault was similarly situated to male athletes on other teams who had not been suspended for assault.[179] The *Thomas* court rejected

---

[173] *Zimmerman*, 836 F.2d at 181.
[174] *Stratford v. Sec'y of Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)).
[175] *Id.* (emphasis added)
[176] *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F.Supp. 2d 616, 628 (W.D. Pa. 2012) (emphasis added)
[177] *Stratford*, 53 F.4th at 74 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007)).
[178] No. 13-514, 2014 U.S. Dist. LEXIS 90699 (W.D. Pa. July 3, 2014) (Kelly, M.J.).
[179] *Id.* at *15-18.

the contention that the athletes' different coaches or teams made them inadequate comparators, noting that this argument "would render implausible any gender based equal protection claim in an athletic setting."[180]

Like the plaintiff in *Thomas*, Plaintiff Players in this matter are members of different teams than their comparators, but both teams fall under the same program against which they allege their Equal Protection claim. Without exhaustively reviewing each allegation of animus-motivated differential treatment, some illustrative examples of differential treatment between similarly situated teams sufficiently demonstrate that Plaintiffs' equal protection claim is plausible.

Plaintiffs' main argument is that the second team was similarly situated to the JV team, yet the second team faced roadblocks to its formation that the all-male JV team did not. Some differences between the second and JV teams are apparent—for example, the JV team consisted of high school students—but SCASD has offered no argument explaining why any such difference is relevant to the barriers to entry imposed on the second team. After the second team's formation, Plaintiffs are similarly situated to members of the first hockey team on several bases for which they allege disparate treatment: the scheduling of ice time, the end-of-year banquet, and the promotion of games. Both teams are governed by the IHC, and no relevant difference is apparent here, either.

---

[180] *Id.* at *17-18.

A more contentious, but ultimately plausible, example of Plaintiff Players being similarly situated to male athletes concerns the initial tryouts for the first team. But for their sex, Plaintiff Players are identically situated to any other applicant. While a difference in the Plaintiff Players' skill level would obviously be a relevant differentiator, it is premature for the Court to assume this disputed fact on a motion to dismiss. In the context of middle school athletics, a difference in skill between the male and female athletes is not such an "obvious[ly] alternative explanation"[181] to the Plaintiff Players being qualified to make the team that it mandates dismissal.

### c.    Unlawful Animus

The majority of SCASD's objections pertain to whether discriminatory motive has plausibly been alleged. Citing to *Washington v. Davis* for the proposition that disproportionate impact does not show purposeful discrimination,[182] Defendants contend that Plaintiff Players were not treated differently "solely because they are female."[183] Defendants are correct that it is insufficient to allege that plaintiffs are female and that they were treated differently than male athletes.[184] A plaintiff alleges sex discrimination in violation of the Equal Protection Clause by pleading "that she was subjected to 'purposeful discrimination' because of her sex,"[185] based upon

---

[181] *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 567 (2007)).

[182] *See* Doc. 48 at 7 (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)).

[183] *Id.* at 8-9, Doc. 67 at 8-10.

[184] *See Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015).

[185] *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293 (3d Cir. 1997) (citing *Keenan v. City of Phila.*, 983 F.3d 459, 465 (3d Cir. 1992)).

some additional "indicia of purposeful discrimination" aside from disparate impact.[186] But "*Davis* does not require a plaintiff to prove that the challenged action rested solely on [unlawful] discriminatory purposes."[187] "To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.'"[188]

First, Plaintiffs' retaliation arguments are misplaced, for as the United States Court of Appeals for the Third Circuit has instructed, a "pure or generic retaliation claim [] simply does not implicate the Equal Protection Clause."[189] Most of Plaintiffs' allegations center around hardships faced by the second team in its entirety rather than Plaintiff Players specifically. As the second team contains three

---

[186] *Green v. City of Phila.*, No. 21-1034, 2022 U.S. App. LEXIS 10624, at *9 (3d Cir. 2022) (unpublished) (quoting *Pennsylvania v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993)).

[187] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (U.S. 1977).

[188] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1915 (2020) (quoting *Village of Arlington Heights*, 429 U.S. at 266; *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose . . . implies that the decision maker . . . selected or reaffirmed a particular course of action *at least in part* 'because of,' not merely 'in spite of,' its adverse effects.") (emphasis added). However, there may be ambiguity around the applicable causation standard; the former cases all arose when examining discriminatory legislation rather than conduct, and our Court of Appeals has sometimes borrowed Title VII's "but-for" standard when resolving Equal Protection claims arising in the employment context. *See Starnes v. Butler Cnty. Court of Common Pleas*, 971 F.3d 416, 426-27 (3d Cir. 2020) (citing the articulation of but-for cause in *Bostock v. Clayton Cnty*, 140 S.Ct. 1731, 1739-40 (2020), and applying the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The Court has not found any analogous Equal Protection case in which both retaliatory and discriminatory motives were alleged against a school district for discriminatory acts. But even if the Court applied a but-for causation standard, it would deny SCASD's motion under these facts. *See Bostock*, 140 S.Ct. at 1739 ("Often, events have multiple but-for causes.").

[189] *Thomas v. Independence Twp.*, 463 F.3d 285, 298 n.6 (3d Cir. 2006) (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997)); *Oras v. Jersey City City*, 328 F.App'x 772, 775 (3d Cir. 2009) (unpublished).

female and ten male athletes, SCASD contends that any hostility directed at the team is not plausibly due to sex-based animus.

Nevertheless, a plaintiff need not rule out every alternative explanation to survive dismissal.[190] And the presence of other motives does not preclude an Equal Protection claim, so long as it is plausible that sex was a motivating factor in the discriminatory conduct. Here, enough circumstantial evidence of animus has been alleged for Plaintiffs' Equal Protection claim to survive dismissal. The amended complaint makes clear that some sort of animus motivated IHC and SCASD to subject the second team to differential treatment, especially given the disparate treatment of the second team and disparaging comments directed towards Plaintiffs. This animus could plausibly be based on sex, retaliatory motive, or both.

The analogous Title VII context is instructive.[191] Under the burden shifting test established in *McDonnell Douglas Corp. v. Green*,[192] a showing that an employer's proffered nondiscriminatory reason for an adverse employment decision is pretextual, while not conclusive,[193] is circumstantial evidence of discriminatory

---

[190] "Plaintiffs are not required 'to plead facts that, if true, definitively rule out all possible innocent explanations.' '[I]t is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible." *In re Generic Pharms. Pricing Antitrust Litig.*, No. 20-3539, 2023 U.S. Dist. LEXIS 31649, at *31 (E.D. Pa. Feb. 27, 2023) (quoting *In re Niaspan Antitrust Litig.*, 42 F.Supp. 3d 735, 753 (E.D. Pa. 2014) and *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp. 3d 772, 788 (N.D. Ill. 2017)).

[191] Courts within this Circuit have applied *McDonnell Douglas* to Equal Protection claims. *See, e.g.*, *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1996); *Starnes v. Butler Cnty Court of Common Pleas*, 971 F.3d 416, 426 (3d Cir. 2020).

[192] 411 U.S. 792 (1973).

[193] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

animus.[194] SCASD's refusal to entertain a second team is made suspect by the fact that many of IHC and SCASD's proffered excuses appear to be pretextual.

For example, the claim that ice hockey time could not be scheduled for another team was belied several times over, and IHC refused to accommodate the team even when it found a separate time not conflicting with the first team's slot. And the seventy-five-day "financial impact analysis" delaying the second team's formation was not conducted for the JV Team, nor was it necessary based on the allegation that SCASD knew the second team would not cost the school any additional funds. One could "infer from the falsity of the explanation that [SCASD] is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"[195]

Next, several of the alleged discriminatory acts occurred before the parties began feuding: Plaintiffs point towards the fact that no girls were rostered on the first team at tryouts and SCASD's early refusal to entertain forming a second team. This dispute was exacerbated by a Title IX sex discrimination lawsuit spearheaded by Plaintiffs, all of whom are female athletes and their parents. In this context, the possibility that SCASD's facially gender-neutral retaliation was tainted by gender

---

[194] *See id.* at 147.
[195] *Id.*

bias—with the harms resulting to the second team's male players being mere collateral damage—is plausible.

Several statements by IHC personnel may also plausibly be interpreted as tainted by gender bias. Ebeck's notes of her meeting with Stidsen state that they were hesitant to allow Plaintiff Players to join any ice hockey team because of concerns about their skill level, their safety, and their "mental well-being."[196] The statement that a second team should not be formed because the players "will be 'crushed' in games" and "constantly losing will defeat them," while stated in gender-neutral terms, may alternatively be plausibly read as endorsing the sort of "well-meaning but overly 'paternalistic' attitude about females which the Supreme Court has viewed with such concern."[197] The same can be said for SCASD and IHC's repeated "safety concerns" about permitting Plaintiff Players on the ice, notwithstanding the fact that several of them had played in the SCYIHA league in previous years. Also relevant is the statement by the first team's manager towards the Plaintiffs, which can plausibly be read to be motivated both by spite and by a desire to prevent girls

---

[196] Doc. 43-15.

[197] *Beattie v. Line Mt. Sch. Dist.*, 992 F.Supp. 2d 384, 292 (M.D. Pa. 2014) (quoting *Force by Force v. Pierce City R-VI School Dist.*, 570 F.Supp. 1020, 1029 (W.D. Mo. 1983)); *Frontiero v. Richardson*, 411 U.S. 677 (1973). While the statement does not mention gender, language which is facially neutral in semantic content can become suggestive of animus based on its historical connotation. *See, e.g.*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

from participating in IHC's program: "no one will ever play with your daughters again. I guarantee you that none of our sons will ever sit on a bench with [A.B.]."[198]

Altogether, many of the allegations are gender-neutral, and the extent to which SCASD or IHC was motivated by sex is unclear. Given the lengthy history of animosity set out in the allegations, the fact that SCASD's retaliation was prompted by a Title IX lawsuit, the circumstantial evidence such as pretextual reasons for not creating a second team, and comments plausibly suggesting gender bias, the allegations are at least sufficient to survive a motion to dismiss. Therefore, the differential treatment between the second team and its similarly situated comparators—the first and JV teams—plausibly states a claim for relief under the Equal Protection Clause at this early juncture in the litigation.

The Court notes that several issues must be resolved later in this litigation. While finding that SCASD's acts are wholly motivated by retaliation or personal spite would be premature at this stage, at summary judgment, Plaintiffs may well need to present additional evidence to avoid this conclusion. Moreover, if SCASD chooses to move for summary judgment on *Monell* grounds, this Court will also need to determine what discriminatory acts are actually traceable to the school district's conduct.

---

[198] Doc. 43 ¶134.

## III.  CONCLUSION

SCASD's motion to dismiss pursuant to Rule 12(b)(6) is granted as to Counts III, IV, and V of the Amended Complaint. Leave to amend these claims is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[199]  A complaint is "futile" if even, as amended, it would fail to state a claim upon which relief could be granted.[200] Although there is a "liberal pleading philosophy of the federal rules" no amendment will be permitted because another opportunity to plead a case would be futile.[201]  As to Plaintiffs' remaining Title IX and Section 1983 Equal Protection Clause claims, the motion to dismiss is denied.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[199]  *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).
[200]  *Id.*
[201]  *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).